In the Matter of BANCROFT DAIRY, INC., a Michigan Corporation, Debtor.

**MICHIGAN MILK PRODUCERS ASSOCIATION, Plaintiff,**

v.

**In re BANCROFT MILK PRODUCTS, INC., a Michigan Corporation, Defendant.**

**In re MENOMINEE IDEAL DAIRY CO., a Michigan Corporation, Defendant.**

**In re CONSOLIDATED DAIRIES OF MICHIGAN, INC., a Michigan Corporation, Defendant.**

**In re SOO CREAMERY, a Michigan Corporation, Defendant.**

**In re CLOVERLAND CREAMERY, INC., a Michigan Corporation, Defendant.**

**In re BANCROFT CREAMERY, INC., a Michigan Corporation, Defendant.**

**Bankruptcy No. M 80 00041.
Adv. Nos. 80–52, 80–49, 80–48, 80–50, 80–51 and 80–63.**

United States Bankruptcy Court, W. D. Michigan.

April 23, 1981.

David Vander Haagen, Lansing, Mich., for plaintiff.

Robert Bordeau, Marquette, Mich., for defendants.

OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

These adversary proceedings are before the court on motions to dismiss complaint or for summary judgment filed by each of the defendants. Since the issues involved are the same for each proceeding, this opinion should apply to all of the proceedings.

The debtor, Bancroft Dairy, Inc., filed a Chapter 11 petition on April 9, 1980. The case was later converted to Chapter 7 on November 26, 1980.

These adversary proceedings were filed by Michigan Milk Producers Association, a Michigan corporation (hereinafter MMPA) pursuant to order of this court dated May 21, 1980, authorizing MMPA to (1) collect balances owing on Bancroft Dairy, Inc.'s accounts receivable generated from sales made prior to April 9, 1980, and (2) to commence suit in this court against any such account debtor refusing payment. The defendants in these adversary proceedings are alleged Bancroft Dairy, Inc. account debtors.

Bancroft Dairy, Inc. executed a security agreement with MMPA on December 21, 1978. The agreement was amended on December 29, 1978. To secure its outstanding debt to MMPA, Bancroft Dairy, Inc. granted MMPA a security interest in all accounts (among other collateral items). Financing statement was filed with the Secretary of State on December 6, 1978.

According to affidavits filed by the defendants, Bancroft Dairy, Inc. and Bancroft Dairy-Newberry Inc. filed a complaint against the account debtors in Michigan Circuit Court for Delta County, on October 12, 1979. On or about December 7, 1979, a settlement was reached among the parties, and the state court action was dismissed with prejudice. MMPA was not a party in this litigation. Also on or about December 7, 1979, Bancroft Dairy, Inc. executed a "Release" of all claims it had against the account debtors, reciting a consideration of $45,000.00 and "other good and valuable considerations, including the matters set forth in that certain agreement between the parties dated December 1, 1979, ...".

Another defendant in the state court action was Alvin W. Weiland. The release agreement was signed by Weiland in the following capacities: for Bancroft Creamery, Inc. as Treasurer; for Cloverland Creamery, Inc. as Secretary; for Bancroft Milk Products, Inc., Soo Creamery, Inc., Consolidated Dairies of Michigan, Inc., Brookvale Dairy, Inc., and Menominee Ideal Dairy, Inc., as Secretary-Treasurer for each; and as an individual. Weiland's name also appears on Bancroft Dairy, Inc.'s Directors' resolution to give MMPA the security interest in accounts, dated December 21, 1978; Weiland signs as Treasurer and as a Director of Bancroft Dairy, Inc. Weiland also submitted an affidavit attached to the account debtors' brief saying he is an officer of each of the account debtors, that he had knowledge of Bancroft Dairy, Inc.'s execution of a security agreement on December 21, 1978, in MMPA's favor; and that at no time before the Chapter 11 petition was filed had any of the account debtors been instructed to pay MMPA directly.

MMPA filed Requests for Admissions (pursuant to Fed.R.Civ.P. 36(a)) addressed to the account debtors. Weiland signed the responses in each case. The responses contain admissions that Weiland was an officer and director of the account debtors at the time the security was given, and on December 1, and 7, 1979. Other admissions confirm Weiland was treasurer and a director of Bancroft Dairy, Inc. at the time the security was given.

The remaining admissions indicate that several terms of the agreement incorporated into the release have not been carried out.

Although the account debtors' motions are styled "Motions to Dismiss Complaint or in the Alternative for Summary Judgment," these motions are to be treated as motions for summary judgment since matters outside the pleadings have been presented to, and are being considered by,

this court. Bankruptcy Rule 712(b)[1]; Fed. R.Civ.P. 12(b); Bankruptcy Rule 756; Fed. R.Civ.P. 56. In *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir., 1962) the court stated:

> "In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponents' are indulgently treated.

> "It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute....'"

Here, MMPA is the non-moving party. However, MMPA is not contending that formal written notice of the assignment of accounts as security was sent from MMPA to the account debtors. On the other hand, there appears to be an issue of fact as to whether the terms of the agreement between Bancroft Dairy, Inc. and the account debtors were ever carried out: answers to MMPA's requests for admission by Alvin Weiland seem to suggest that many of the terms were not carried out.

### DISCUSSION

1. Whether the state court's dismissal of account assignor's collection action with prejudice bars the assignee's action to collect the accounts in this court?

The account debtors claim that the state Circuit Judge's order dismissing Bancroft Dairy, Inc.'s action with prejudice bars MMPA from suing account debtors in this court on the assigned accounts. The bar arises under the doctrine of res judicata, according to the account debtors.

■ Under res judicata, a judgment on the merits in a prior suit *involving the same parties or their privies* bars a second suit

based on the same cause of action. *E. g. Lawlor v. National Screen Service Corporation*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); 1 B *Moore's Federal Practice* (2d Ed.) ¶ 0.405[1], p. 621. Michigan law also requires the former action to have been between the same parties or their privies, for the judgment to have res judicata effect in a later action. 14 *M.L.P.* Judgment § 163, p. 608 and cases cited therein. Since MMPA was not a part to the state court litigation, the state court dismissal can not bar MMPA's action in this court unless MMPA was in privity with Bancroft Dairy, Inc.

■ A privy is one who, *after rendition of the judgment,* has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase. *Howell v. Vito's Trucking Co.*, 386 Mich. 37, 43, 191 N.W.2d 313 (1971) (emphasis supplied). "The successor is bound by a judgment adverse to his predecessor only if the transfer of interest occurred after commencement of the suit in which the judgment was rendered." 1 B *Moore's Federal Practice* (2d Ed.) ¶ 0.411[1], p. 1257.

■ The assignment of the accounts to MMPA took place before the state court action was commenced. Thus under either the Federal or the State rule, MMPA is not considered to be in privity with Bancroft Dairy, Inc. with regard to the state court action. MMPA is not barred from pursuing this action in this court by the state court's dismissal of Bancroft Dairy, Inc.'s action against the account debtors.

2. Whether assignee is subject to account debtor's defense of release?

  a. The Michigan U.C.C. provides:

> "(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9206 the rights of an assignee are subject to:

1. Bankruptcy Reform Act of 1978, Title IV § 405(d) states that the Bankruptcy Rules in effect on September 20, 1979, will continue to apply to cases under the Bankruptcy Reform Act of 1978 to the extent they are not inconsistent with the new Act.

(a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." M.C.L. 440.-9318(1); M.S.A. 19.9318(1) (Callaghan, 1980, Supp.)

If the release could be considered a defense arising from the terms of the contract, it could be asserted against MMPA regardless of any notice to the account debtors. But if it is not considered a contract defense, it can only be asserted if it accrued before the account debtors received notification of the assignment.

Michigan case law on this question is sparse. In *Dimmitt & Owens v. Realtek*, 90 Mich.App. 429, 280 N.W.2d 827 (1979), the account debtor produced a release it had obtained from the assignor. However the debtor was seeking to use it to obtain a default judgment against the assignor, not as a defense against the assignee. The court's opinion reads:

"Realtek alleged in its cross-claim against Clover that it had received from Clover a release from "all liability arising out of the contract between the parties and for any and all work performed by the defendant". By its own terms, as pleaded by Realtek, the release only covered liability arising out of the contract between Realtek and Clover, and did not purport to cover liability arising out of the contract between Dimmitt & Owens and Clover. Under § 9318(3), Realtek's duty as an account debtor to pay Dimmitt & Owens, the assignee, was entirely separate from its duty under its contract with Clover, the assignor. Therefore, we conclude that Realtek failed to plead a release which applied to the instant situation and that the judgment of no cause of action was proper." Id. at 435–6, 280 N.W.2d 827.

Other courts have construed U.C.C. 9–318(1)(a), though not in situations precisely like this one.

In *Bank Leumi Trust Co. of New York v. Collins Sales Service, Inc.*, 47 N.Y.2d 888, 419 N.Y.S.2d 474, 393 N.E.2d 468, 27 U.C.C. Rep. 582 (N.Y.1979), the account debtor and assignor had agreed that the assignor could set-off the debt against an indebtedness the assignor had to one of its account creditors; the same person was principal officer and shareholder of both assignor's debtor and assignor's creditor. When the assignee sued to collect from the account debtor, that debtor tried to assert the set-off. The Court of Appeals held the set-off contract was not a claim or defense arising from the original contract between account debtor and assignor, but a collateral agreement in which the method of payment of assignor's debt to its account creditor was established. *The Bank Leumi Trust Co.* case may stand for the proposition that an agreement is not necessarily usable as a defense "arising from" the terms of the original contract, though the terms of the contract had a bearing on the terms of the agreement.

In *James Talcott, Inc. v. Sacks Wollen Co., Inc.*, 18 U.C.C.Rep. 534 (N.Y.Sup.Ct. 1975), the account debtor had also *sold* goods to the assignor on an express promise that the account debtor could set-off any of *assignor's* outstanding debts against what it owed assignor. The set-off claim was held to be a separate transaction. In *Fall River Trust Co. v. B.G Browdy, Inc.*, 346 Mass. 614, 195 N.E.2d 63, 2 U.C.C.Rep. 1 (Mass. 1964), the account debtor was not allowed to claim under 9–318(1)(a) that goods were missing from a shipment when it could not show that the goods were covered by the particular accounts assigned. These cases indicate that courts are not broadly construing the scope of the original contract between assignor and account debtor.

In *Seattle-First National Bank v. Oregon Pacific Industries, Inc.*, 262 Or. 578, 581, 500 P.2d 1033, 1034, 11 U.C.C.Rep. 270, 273 (1972) the court did not allow set-off of damages from a failure to ship two plywood orders not included in the assigned invoice:

"The set-off or claim the defendant seeks to assert is an unrelated set-off because it

arises out of a breach of a contract not connected with the invoice assigned to the bank. For this reason the defendant can assert the set-off only if it accrued before the defendant was notified of Centralia's assignment to the bank." *Ertel v. Radio Corporation of America*, 261 Ind. 573, 307 N.E.2d 471, 14 U.C.C.Rep. 514 (Ind.1974).

In Michigan a release must be supported by a valid, sufficient consideration to be effective. *Babcock v. Public Bank*, 366 Mich. 124, 135, 114 N.W.2d 159 (1962); 19 M.L.P. Release § 3. This is because waiver of a substantial right is a matter of contract. *Babcock v. Public Bank, supra.*

I believe that when read together, these authorities favor characterizing the "release" agreement as a separate transaction, not to be considered as a defense or claim arising under the terms of the contracts assigned. Of course considering the release agreement itself as a separate defense, not arising from the terms of the contract, does not prevent the account debtors from asserting defenses which may have been considered when the parties were negotiating the release agreement. Any defenses or claims arising from the terms of the contract which generated the account or which accrued before notification, if there was notification, may be asserted by the account debtors. But asserting the terms of the release agreement is not the same as asserting the terms of the contract. I think that the alternative position would create a "loophole" exploitable in situations where the same person (or persons) is an "insider" to both assignor and account debtor. The result would be an unjustified infringement upon an assignee's rights under the Code.

b. Notification thus becomes an issue in this case. The U.C.C. still allows assertion of "any other defense or claim of the account debtor against the assignor which accrues before the account debtor *receives notification* of the assignment". The question is, must "notification" be a tangible *communication* to the account debtor?

Several code provisions deal with "notification":

"(25) a person has "notice" of a fact when:

(a) He has actual knowledge of it; or

(b) He has received a notice or notification of it: or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this act.

(26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when:

(a) It comes to his attention; or

(b) It is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications." M.C.L. § 440.-1201(25), (26); M.S.A. § 19.1201(25), (26) [Callaghan 1980 Supp.]

The provisions cited differentiate between "notice" and "notification", with "notice" including "actual knowledge". Elsewhere in the U.C.C. are provisions requiring a party to *give* notice (or "notify") of a fact even if the party to which it is given already has actual knowledge of the fact. See U.C.C. §§ 2–607(3), 1–201(26); *Standard Alliance Industries Inc., v. The Black Clawson Co.*, 587 F.2d 813 (6th Cir. 1978); *In re Morweld Steel Products Corporation*, 8 Br. 946 (Bkrtcy.W.D.Mich.1981) (a buyer, having accepted goods, must have notified seller of defects in order to maintain a cause of action for damages even if seller had actual knowledge of the defects.) Of

course, the intent of § 2–607(3) is to force the buyer to begin a negotiation process before he files suit in addition to giving the seller notice; § 9–318(1) simply preserves the traditional rules for account debtor's defenses against assignees. Compare U.C.C. § 2–607 Official Comment 4 with U.C.C. § 9–318 Official Comment 1.

Despite the difficulties mentioned in the above paragraph, I believe that the phrase, "it comes to his attention", is properly interpreted as including a situation where an "insider" of the account debtor was present at and participated in the assignment of the account. [The term "insider" is borrowed from the Bankruptcy Reform Act of 1978, § 101(25), 11 U.S.C. § 101(25) as a convenient way of characterizing Mr. Weiland's position for purposes of deciding this motion. Disposition of this motion will not be a conclusive determination that the account debtors had notification of the assignment through him. See p. 3, supra]

First, the case law available supports this interpretation. In *Gateway National Bank of Chicago v. Saxe, Bacon & Bolan*, 40 App.Div.2d 653, 336 N.Y.S.2d 668, 11 U.C.C. Rep. 668 (1972), a senior partner of the account debtor was also chairman of assignee's board of directors; he had acknowledged the existence of the assignment by forwarding to assignee a copy of the financing statement using account debtor's stationery. The court held:

"Since no particular form of notice is required by the Code and actual knowledge of a fact is notice thereof (UCC § 1–201[25], the knowledge of defendant's senior partner is imputed to it. Notice of the assignment would, of course, only have relevance to the counterclaim and not to the defense, because only claims arising independently of the contract between the account debtor and the assignor which accrue after notification are cut off thereby. (UCC § 9–318.)" Id. 336 N.Y.S.2d at 670, 11 U.C.C.Rep. at 669

In *Chase Manhattan Bank (N.A.) v. State of New York*, 40 N.Y.2d 590, 357 N.E.2d 366, 20 U.C.C.Rep. 577 (1976), the state was the account debtor and it was held that merely filing a UCC financing statement with the Secretary of State did not constitute actual notice of the assignment. However, the court stated:

"Section 1–201 (subd. [26] provides, in part, that '[a] person "receives" a notice or notification when (a) it comes to his attention; or (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.' These two provisions, taken together and without more, establish a requirement of actual notice to the account debtor before the preclusion of setoffs. . . .

The point is that a paper filed with a state office solely as a commercial repository under the Code in order to give constructive notice to all the world is not actual notice. The subordinate official or clerk who receives a financing statement for filing, if he is not to be wasting the taxpayers' money, has no duty beyond filing and indexing the statement. The indexing and the filing is for the benefit of outsiders whose duty it may be to search the index and read the indexed statements before they extend credit." Id. at 593, 595, 357 N.E.2d at 368, 369, 20 U.C.C.Rep. at 579, 81.

The court chose to stress "notice" instead of "notification". In all, I believe the holding in *Gateway National Bank* is still the law in New York.

In *Bank of Salt Lake v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, 534 P.2d 887 16 U.C.C.Rep. 1427 (Utah, 1975) the court cited U.C.C. §§ 1–201(25), (26) and (27) and stated: ". . . with reference to the assignments, the [account debtor] to have notice would have had to have actual knowledge, received a notice or notification, or from the circumstances had reason to know that they existed."

In 1 Anderson, Uniform Commercial Code (2d Ed. 1970) § 1–201.83, pp. 115–6, it is stated:

"When the person "given" a notice actually learns of its contents, he has received

the notice. The Code describes this situation in the words "when it comes to his attention." This is a rather cryptic statement and should be interpreted as above stated to require actual knowledge.

This interpretation is supported by the conclusion that since a person of course receives notice when he acquires actual knowledge there should be some express recognition in the Code of that fact, but unless the "attention" clause is given the effect of knowledge, the Code omits the most obvious receiving of notice situation which can arise. Secondly, as the Code expressly provides for notice sent to a place of business, it would seem that the ordinary letter sent to a business address marked "attention of" a particular person would come within the provision discussed under (b) of this text which follows, and not within the "attention" clause of the Code."

■ There is a line of cases construing UCC § 9–318(3), which reads:

"(3) The account debtor is authorized to pay the assignor until the account debtor received notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor must pay the assignor." M.C.L. § 440.9318(3); M.S.A. § 519.-9318(3) (Callaghan 1980 Supp.)

These cases are exemplified by *Commercial Savings Bank v. G. & J. Wood Products Co., Inc.*, 46 Mich.App. 133, 207 N.W.2d 401 (1973), which holds that even where account debtor has actual knowledge of the assignment, the debtor can set-off amounts paid to assignor if the notification did not direct debtor to pay the assignee instead. *E. g. Estate of Haas v. Metro-Goldwyn Mayer, Inc.*, 617 F.2d 1136 (5th Cir. 1980); *First National Bank of East St. Louis v. Board of Education School Dist. No. 189*, 68 Ill. App.3d 21, 24 Ill.Dec. 670, 385 N.E.2d 811,

26 U.C.C.Rep. 1374 (Ill.App.1979). But the "authorized to pay" language used by § 9–318(3) indicates that this is a defense set up to protect account debtors, who have made payments of some kind to assignors, from having to pay twice on one debt. § 9–318(3) uses the "notification" of assignment *and* the direction to pay assignee in the conjunctive, which means these are two different requirements. § 9–318(1)(b) uses the single requirement of receiving notification. It follows that if an account debtor receives a notification of the assignment which does not contain a direction to pay the assignee, and the account debtor makes no payments to either assignor or assignee, the account debtor cannot use non-compliance with § 9–318(3) as a defense against the assignee. The account debtor also cannot use non-compliance with § 9–318(3) to argue that it did not "receive notification" under § 9–318(1)(b) and thus can assert non-contract defenses or claims. The account debtor's right to assert "other" defenses or claims is governed by § 9–318(1)(b), not § 9–318(3).

■ In this case, payments by the account debtors to the assignor are issues of fact; the account debtors will have a defense under § 9–318(3) to the extent that the proofs show payments were made.

Since the facts can be construed in a way that would disallow account debtor's assertion of the state court judgment and release as a defense against the assignee, the account debtors' motion for summary judgment should be denied.