**In re TELEPHONE WAREHOUSE, INC., et al., Debtors.**

Nos. 00–2105 (MFW) to 002110 (MFW).

United States Bankruptcy Court, D. Delaware.

Feb. 28, 2001.

Neil B. Glassman, Jeffrey M. Schlerf, Elio Battista, Jr., The Bayard Firm, Wilmington, Thomas E. Lauria, Frank L. Eaton, White & Case LLP, Miami, FL, for Debtors.

Norman Pernick, Mark Minuti, Tara Lattomus, Saul Ewing Remick & Saul LLP, Wilmington, Bruce Buechler, Lowenstein Sandler, PC, Roseland, NJ, for the Official Committee of Unsecured Creditors.

John D. Demmy, Joseph H. Huston, Jr., Stevens & Lee, Wilmington, Lawrence Ream, Richard G. Birinyi, Bullivant Houser Bailey, P.C., Seattle, WA, for Voicestream Wireless and Omnipoint Communications.

Daniel K. Astin, Philadelphia, PA, Office of the United States Trustee.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are the Motions of Voicestream Wireless Corporation ("Voicestream"), and related companies, Omnipoint Corporation ("Omnipoint") and Aerial Communications, Inc. ("Aerial")(collectively "the Movants") for determination that the Movants have a right of recoupment or setoff against obligations owed to the Debtors and the Motion of the Debtors to compel payment from the Movants. After considering the Motions and the objections thereto, we allow the recoupment/setoff and direct the Movants to pay the balance due, if any.

## I. FACTUAL BACKGROUND

Telephone Warehouse, Inc., Let's Talk Cellular & Wireless, Inc., Cellular Warehouse, Inc., Cellular USA, National Cellular, Incorporated, and Sosebee Enterprises, Inc. (collectively "the Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code on May 30, 2000. The Debtors are among the largest independent specialty retailers of cellular and wireless products, services, and accessories in the United States. Their stores sell as many as 30 different makes and models of cellular and PCS phones, pagers, and other accessories. They also offer subscription services from a large number of regional and national carriers.

Pre-petition, the Debtors entered into dealer agreements with Voicestream for the Denver and San Antonio markets. The Debtors also had a relationship with Omnipoint evidenced by a Memorandum of Understanding dated November 18, 1996, and a relationship with Aerial evidenced by a Letter of Intent dated October 4, 1999. Voicestream acquired Omnipoint on February 25, 2000, and Aerial on May 4, 2000.

Under the agreements with the Debtors, the Movants sold cellular phones and other products to the Debtors, who in turn sold them to the public. When the Debtors sold a phone, they also sold cellular service provided by one of the Movants to the customer by activating the phone. The Debtors earned commissions on each activation. The amount of commissions depended on the total number of activations in a particular month, which were not deactivated in that same month. Depending on the level of activations, the Debtors might be entitled to bonuses, reimbursement for advertising the Movants' products, and/or discounts on the price of the phones and other products sold to them.

When the Debtors filed bankruptcy, there were various amounts due between the Debtors and the Movants. The Debtors demanded payment from the Movants who asserted a right of recoupment or setoff of sums due them. When the Movants failed to pay, the Debtors removed all of Movants' product from their stores. The Debtors filed a Motion to compel performance by each of the Movants, and the Movants filed Motions for determination of their right of setoff or recoupment.[2] After

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The Movants originally objected to the Debtors' Motion on procedural grounds (that an

hearings held on October 25 and November 7, 2000, the parties submitted briefs on the legal issues.

## II. *JURISDICTION*

The Court has jurisdiction over these Motions pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(B), (C), (K) and (O).

## III. *DISCUSSION*

### A. *Recoupment*

■ Recoupment is an equitable remedy which permits the offset of mutual debts when the respective obligations are based on the same transaction or occurrence. *See, e.g., Anes v. Dehart (In re Anes)*, 195 F.3d 177, 182 (3d Cir.1999); *University Med. Ctr. v. Sullivan (University Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.1992).

■ The Third Circuit defined the equitable doctrine of recoupment as follows:

> Recoupment is the setting up of a demand *arising from the same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.

*University Medical Center*, 973 F.2d at 1079 (*quoting* 4 Collier on Bankruptcy § 553.03, at 553–15–17)(emphasis in original). As the Third Circuit explained in *Lee v. Schweiker*:

> The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the

limitations on setoff in bankruptcy would be inequitable.

739 F.2d 870, 875 (3d Cir.1984).

In the bankruptcy context, recoupment has often been applied where the relevant claims arise out of a single contract "that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction." ... However, an express contractual right is not necessary to effect a recoupment.... Nor does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment.... For the purposes of recoupment, a mere logical relationship is not enough: the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the 'same transaction.'" Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.

*University Medical Center*, 973 F.2d at 1080–81. The doctrine of recoupment permits the offset of debts even if one arose pre-petition and the other arose post-petition, so long as both arose from the same transaction. *See, e.g., Anes*, 195 F.3d at 182; *Lee v. Schweiker*, 739 F.2d at 875.

■ The Movants assert that they have a right to recoup the sums due them from the Debtors because they arise from the same transaction, namely the sale of cellular phones and service by the Debtors. The bulk of the Movants' obligations to the Debtors represent commissions which the Debtors earned when they activated the Movants' phone service for customers. To the extent that the obligations between the parties relate to the commissions (includ-

adversary is necessary to permit the Movants to conduct discovery and raise their setoff/recoupment defenses). However, these objections were satisfied by our permitting discovery and consolidating the setoff Motions with the Debtors' Motion for trial. Since all the

Motions involve the same legal issues and similar factual issues, we address them as one. However, for purposes of accounting, the parties concede that this must be done on a company by company basis.

ing bonuses, deactivations and reactivations), the Debtors concede that they arise from the same transaction.

However, the Debtors assert that not all of their obligations to the Movants arise from a single transaction. Specifically, the Debtors note that their debt to the Movants is largely for the purchase of equipment while the majority of Movants' obligations to them represent commissions due for activation of phone service. The Debtors assert these are separate business transactions. As evidence, the Debtors point to the fact that the equipment purchases are represented by numerous distinct purchase orders which are unrelated to the activation of phones, while the commissions are reflected on monthly statements.

The Movants disagree with the characterization of their relationship given by the Debtors. They note that the contracts themselves contemplate that the Debtors will purchase phones at wholesale prices and will sell those phones to customers at the same time that the Debtors activate the Movants' cellular service for the customer.

Although it is contemplated by the dealer agreements between the parties, the Debtors argue that their obligation to pay for the phone equipment and other products of the Movants that they buy, is fundamentally different from the sales commissions. For example, there is no requirement that any specific phone model be purchased by the Debtors or the customer.

We conclude that the commissions and equipment purchases are part of a single integrated business transaction. We do not find the differences cited by the Debtors significant. The purchase of the equipment is contemplated (and dealt with) in the agreements between the Movants and the Debtors. (Exhibit D–1 at § 3; Exhibit D–2 at Exhibit A; Exhibit D–3 at ¶ 4.) It is part and parcel of the relationship between the parties. For example, the Debtors cannot activate the Movants' service on any equipment except the Movants' equipment. Therefore, there is a direct correlation between the sale of the Movants' equipment and commissions the Debtors earn for activations. While the Debtors could sell the phones to customers without activating service, the phones would be worthless to the customers. Further, under their contracts with the Movants, the Debtors pay a discounted price on phones if service is activated. Therefore, the activation of service has a direct correlation to the amount that the Debtors owe for the equipment.

Similarly, the amounts due to the Debtors for advertising (the advertising "CoOp") are an integral part of the parties' business transaction. The Debtors "earn" advertising CoOp credit based on the number of activations. The advertising CoOp is used to advertise the Movants' products (equipment *and* cellular service).

Thus, we conclude that all the sums due between the parties are part of a single integrated business transaction and subject to the rights of recoupment. Our conclusion is bolstered by the fact that the parties regularly offset the CoOp, commissions and bonuses against the amounts due for equipment purchases. (Exhibit D–72.)

B.  *Setoff*

■ Even if the Movants were not entitled to recoup the amounts due them against the amounts they owe, we conclude that they have the right to setoff those amounts. Setoff is a matter of state law, but is preserved, with some restrictions,[3] by section 553 of the Bankruptcy Code. That section specifically provides that "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before

---

3. None of the exceptions to the right of setoff articulated by section 553 are implicated in this case.

the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

■ To permit setoff there must be mutuality of debt. That is, the debt must be owed by and to the same two parties. In this case, the parties agree that this requires that any debt owed by and between the Debtors and Omnipoint cannot be used as an offset against any debt between the Debtors and Aerial or Voicestream. Thus, the setoff rights asserted by the Movants are articulated on a company by company basis.

■ Setoff, in contrast to recoupment, requires that both debts arise prepetition. *See, e.g., Anes,* 195 F.3d at 182; *Lee v. Schweiker,* 739 F.2d at 875. This is where, the Debtors assert, the Movants' argument fails. The Debtors assert that their obligations to the Movants for equipment purchased arose pre-petition. However, they assert that part of the Movants' debt to them arose post-petition (e.g., commissions for activating phones in April and May, 2000). Although the April and May activations occurred pre-petition, the Debtors assert that the obligation to pay those commissions arose post-petition because, under the parties' agreements, the commissions are not due until 45 to 60 days after activation. The reason for the delay is not simply to allow the monthly reports to be prepared and submitted for payment, but also to assure that any deactivation that occurs within the same month as the activation will be noted so the Debtors are not credited with that activation.[4]

However, we conclude that the timing of payment does not affect when the obligation arose. The Debtors earned a commission when the phone was activated. That claim was contingent on the phone not being deactivated within the same

month and was unliquidated (since the amount of commission could vary depending on the number of activations that month). The Bankruptcy Code defines a "claim" to include a contingent and unliquidated right to payment; a "claim" arises when the right to payment accrues, not when payment is due. *See* 11 U.S.C. § 101(5).

This conclusion is supported by the case law on setoffs. *See, e.g., United States v. Gerth,* 991 F.2d 1428, 1433 (8th Cir. 1993)("for setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed"); *In re Young,* 144 B.R. 45, 46–47 (Bankr. N.D.Tex.1992)("setoff is permitted when, at the time the bankruptcy petition is filed, the debt is absolutely owing but is not presently due, or when a definite liability has accrued but is not yet liquidated"); *In re Nickerson & Nickerson, Inc.,* 62 B.R. 83, 85 (Bankr.D.Neb.1986)("The right of setoff may be asserted in bankruptcy even though one of the debts involved is absolutely owing but not presently due when the petition is filed"); *Traders Bank of Kansas City v. Stonitsch (In re Isis Foods, Inc.),* 24 B.R. 75, 76 (Bankr.W.D.Mo. 1982)(where "there could be no question about existence of debt, and fact that it was 'absolutely owing', albeit as yet unmatured, the bank's right of setoff must be regarded as manifestly present"). Thus, we conclude that all the debts in question arose pre-petition.

### C. *Priority*

■ The Debtors assert that, under Washington state law (which the agreements provide applies), the Movants' right of setoff is subject to the prior perfected security interest of the Debtors' Lenders which have a first security interest in accounts receivable, including those due from

---

4. The amount of commission due to the Debtors increased if sales went above certain levels. Deactivations within the same month of activation were not counted toward achievement of those levels. (Exhibit D–1 at pp. 22–23; Exhibit D–2 at p. 6; Exhibit D–3 at ¶ 6.)

the Movants.[5] It cites several cases from Washington which purport to hold that a creditor with a security interest in accounts receivable who perfects under the Uniform Commercial Code ("UCC") has priority over a creditor with setoff rights. *See, e.g., Leischner v. Alldridge*, 114 Wash.2d 753, 790 P.2d 1234 (1990); *Central Washington Bank v. Mendelson–Zeller, Inc.*, 113 Wash.2d 346, 779 P.2d 697 (1989).

However, both of those cases are distinguishable. *Mendelson–Zeller* dealt with the respective priorities of an agent who arranged the sale of a crop and a bank which had a security interest in the crop and its proceeds. 779 P.2d at 349–50. The sales agent in that case sought priority over the bank by arguing alternatively that it was a buyer in the ordinary course of business of the crops (since its agreement with the owner was a consignment), it was a holder in due course of the notes received for payment of the crops, or there was a priority akin to a garageman's lien on proceeds for those who perform services to generate those proceeds. *Id.* at 356–62. None of those arguments raised the issue which is before us: whether an account debtor has a setoff right which is superior to the bank's security interest in accounts receivable.

Similarly, the *Leischner* case is inapposite. *Leischner* dealt with the respective priorities of a federal tax lien in real estate and a setoff right of a buyer of the real estate under a land contract for attorneys' fees and costs incurred in bringing a quiet title action. 114 Wash.2d at 755–56, 790 P.2d 1234. The Court held that whatever setoff rights the buyer might have under the land contract, they are subordinate to the federal tax lien by virtue of the tax lien statute. *Id.* at 759, 790 P.2d 1234. Since the instant case does not implicate the federal tax lien statute, *Leischner* is not applicable.

The Debtors also assert that the Lenders' lien on the Debtors' accounts receivable has priority over the Movants' setoff or recoupment rights under the UCC because the Lenders' lien was perfected first. The Debtors assert that the Lenders' liens were perfected pre-petition (in March, 1998), while the Movants' setoff rights attained secured status under section 506 of the Bankruptcy Code on the Debtors' filing (May 30, 2000). Thus, the Debtors argue the Lenders' lien, being perfected first, is superior.

The Debtors' argument, however, ignores the specific section of the UCC which deals with competing security interests in just such a situation as is before us. Section 9–318 provides:

Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor which accrues before the account debtor receives notification of the assignment.

In the instant case, rather than agree not to assert defenses, the agreement between the Movants and the Debtors specifically preserved to the Movants the right to assert any setoff rights. (Exhibit D–1 at p. 26, ¶ C; Exhibit D–2 at p. 9, ¶ 2.) Further, there is no evidence that the Lenders provided any notice of their security interest to the Movants. Thus, under section 9–318 of the UCC, the Movants' right of setoff has priority over any lien of the Lenders in the accounts receivable.

### D. *Accounting*

#### 1. *Commissions*

■ At the hearing held on October 25, 2000, the Debtors presented substantial

**5.** Although the Movants assert that the Debtors have no standing to assert the Lenders' priority over the Movants, the DIP credit agreement expressly requires that the Debtors protect the Lenders' rights. (*See* Credit Agreement at § 5.14).

documentation (over 1,000 pages) supporting the amounts due to them from the Movants. (Exhibits D–1 to D–80.) The Debtors' records contain an accounting of all activations of services for the Movants performed at all of the Debtors' numerous retail locations. The Debtors have established that their point of sale computers recorded the activation of service at the time of sale. The Debtors' witness testified that all of the Debtors' commission reports are based on their point of sale records. The Debtors introduced their detailed reports of activations and commissions due, as well as any evidence they had received from the Movants showing credits due Movants for deactivations and amounts due by them for equipment purchases.

The Movants suggest that the Debtors' evidence is insufficient because there could have been an error at the time of entry. However, they have presented no proof that any errors were committed. The Movants' suggestion is not sufficient to persuade us that the Debtors' records are not accurate.[6] "Documents prepared in the ordinary course of business are generally presumed to be reliable and trustworthy for two reasons: First, businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful. Second, routine and habitual patterns of creation lend reliability to business records." *Certain Underwriters at Lloyd's London v. Sinkovich*, 232 F.3d 200, 204–05 (4th Cir.2000)(*quoting United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir.1993)). *See also United States v. Rich*, 580 F.2d 929, 938 (9th Cir.1978). The documents upon which the Debtors rely (and that the Movants question) are the records created by the keystrokes of the Debtors' employees at the point of purchase. Those records clearly fall within the presumption of accuracy.

Further, the Movants have had the Debtors' records for months, but have not presented any evidence to dispute their accuracy. Instead they cross-examined the Debtors' witness (and presented testimony) questioning the Debtors' accounting. One question raised by Movants was their assertion that the Debtors' records did not account for differences in commissions earned based on pre-paid versus post-paid activations. Assuming that the Debtors' reports did not have a separate accounting for each, the Movants reduced the amount due by assuming that post-paid activations represented only 60% of total activations, allegedly based on historical numbers. (Exhibit VS–4.) However, the Movants presented no evidence to support this assumption. Further, the records presented by the Debtors clearly evidence whether an activation was pre-paid or post-paid. Therefore, we conclude that the Debtors' records provide the more accurate calculation of commissions.

Further, the Debtors assert that their records can only provide part of the amount due to them. They assert they are entitled to commissions for reactivations and other bonuses under the parties' agreements. However, they assert that they are unable to provide any accounting for those amounts due, since the Movants are the only ones with that information and they have failed to provide it. (N.T. at 38–41.) The information within the Movants' sole possession also includes deactivations that occurred within the same month as activations, which would reduce the amounts due to the Debtors. The Debtors assert that it must be assumed that the total of these adjustments would favor the Debtors, otherwise the Movants would surely have presented this evidence.

■■■ We agree with the Debtors. The Movants' failure to produce (in discovery

---

**6.** Movants neglect to address the possibility that if there were any errors, it is equally possible that these errors were in their favor.

Because we find no evidence that the Debtors' records are inaccurate, we need not address that issue.

and at trial) any evidence on these credits and deductions, which is in the sole possession of the Movants, creates an inference that that evidence would not be favorable to the Movants. *See, e.g., United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 206 (3d Cir. 1970)("where evidence which would be properly part of a case, is within the control of one party or the other, whose interest would naturally be to produce it, and without satisfactory explanation, the party fails to do so, the [court] may draw an inference that the evidence would be unfavorable, if that evidence was presented at the trial"). *See also Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995); *Cromling v. Pittsburgh & Lake Erie R.R. Co.*, 327 F.2d 142, 148 (3d Cir.1964). Consequently, we find the amounts due to the Debtors for commissions to be as set forth in the Debtors' records.

### 2. *Advertising CoOp*

With respect to the advertising CoOp, the Movants assert that the Debtors have failed to establish any entitlement to it. They assert that the Debtors' records simply accrue amounts for advertising and that the Debtors have presented no proof that they actually expended any sums for advertising or otherwise complied with the terms of the parties' agreements. The Debtors assert in response that the Movants have never provided any evidence to dispute any of their asserted CoOp claims.

The advertising CoOp provisions of the parties' agreements provide generally that the Debtors would be entitled to a credit towards its advertising costs on a per activation basis. (Exhibit D–1 at p. 24, § B2; Exhibit D–2 at p. 5; Exhibit D–3 at p. 5.) In certain instances, the Debtors were required to obtain pre-approval of any advertising campaigns; in other instances, the Debtors were required to submit copies of the invoices for advertising and other documentation before the advertising CoOp would be credited. (*Id.*)

At the trial, the Debtors' witness testified that the amount claimed by the Debtors for advertising CoOp had been obtained from the books and records of the Debtors kept in the ordinary course of business. He testified that he had checked all the amounts on his summary of the claims (Exhibit D–4) against any documentation received from the Movants to reconcile them. He testified that on numerous occasions during the course of this litigation, he had asked for information and any documentation the Movants had to dispute any of the Debtors' claims. None was forthcoming.

At trial, the Movants presented no evidence to dispute the amount sought by the Debtors for advertising CoOp. Instead, in cross examination the Movants sought to discredit the Debtors' evidence by asserting that the Debtors had not introduced actual advertisements or other proof that they had paid these expenses. Further, they presented a witness who asserted that, without such proof, nothing was due to the Debtors. However, on cross examination, the Movants' witness had to admit that he had seen requests from the Debtors for reimbursement of advertising claims in the Movants' own records. He admitted that he had not made an effort to reconcile those claims against the amounts now requested by the Debtors. Furthermore, he had to admit that the amount which the Debtors assert is due for advertising CoOp for Omnipoint is the exact same amount as Omnipoint has acknowledged was due. (*Compare* Exhibit D–9 with Exhibit D–72.)

For the same reasons set forth above, we conclude that the Debtors' evidence on the amounts due for advertising CoOp are accurate. They are based on documents kept in the Debtors' ordinary course of business. Further, although the Movants acknowledged having documents relevant to this issue, they failed to present them. We therefore infer that that evidence would not support the Movants' case.

The Movants assert, however, that CoOp does not represent cash due from them but instead is merely a credit to which the Debtors would be entitled (assuming they meet the criteria). Therefore, the Movants assert that no net cash amount for CoOp is due from them. While this may be true, it is not really relevant. From the Debtors' accounting, it is clear that the Debtors are merely using the CoOp as a credit. (Exhibits D–8, D–9 & D–10.) For example, the Aerial CoOp claim is $64,590 which the Debtors assert as one credit against total claims Aerial has against them of $171,240. The CoOp credits which the Debtors assert against Omnipoint and Voicestream similarly are significantly less than the claims they have against the Debtors.

### 3. *Calculations of Amounts Due*

Based on the above, we determine that the amounts due between the parties is as set forth in Exhibit D–4. However, since we conclude that all claims (including the Debtors' commissions for April and May) are subject to recoupment or setoff, we find the following amounts are due to/from the Debtors: Aerial owes the Debtors $104,246; the Debtors owe Omnipoint $520,238; and Voicestream owes the Debtors $56,408.

## IV. *CONCLUSION*

For the foregoing reasons, we grant the Motion of Voicestream Wireless Corporation, Omnipoint Corporation, and Aerial Communications, Inc., and determine that they have the right to recoup or setoff sums due them from the Debtors against obligations owed by them to the Debtors. We similarly grant, in part, the Debtors' Motion to compel payment.