In re COMMUNICATION DYNAMICS, INC., et al., Debtors.

No. 02–12753 (MFW).

United States Bankruptcy Court, D. Delaware.

Oct. 14, 2003.

Eric Michael Sutty, GianClaudio Finizio, Jeffrey M. Schlerf, The Bayard Firm, Wilmington, DE, for Debtors.

Mark S. Kenney, Office of U.S. Trustee, Wilmington, DE, U.S. Trustee.

Pauline K. Morgan, Sharon M. Zieg, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Official Committee of Unsecured Creditors.

## *OPINION*[1]

MARY F. WALRATH, Chief Judge.

Before the Court is the Motion for Relief from Automatic Stay filed by Thomas & Betts Corporation ("T & B") seeking authority to setoff or recoup sales credits due to Communication Dynamics, Inc. ("the Debtor") against an account receivable due to T & B by the Debtor. For the reasons set forth below, the Motion will be granted.

## I. *BACKGROUND*

On February 20, 2001, T & B and the Debtor entered into an agreement ("the Agreement") pursuant to which the Debtor agreed to distribute communication equipment for T & B. Under the Agreement, T & B established standard prices for its goods. The goods bought by the Debtor from T & B at the standard prices were placed in the Debtor's inventory to sell to end-users. Upon approval from T & B, the Debtor frequently sold the goods at a price lower than the standard prices. Under the Agreement, the Debtor was entitled to a credit from T & B for the difference between the standard price and the lower price at which the goods were sold.

On March 30, 2001, the Debtor entered into an agreement ("the Credit Agreement") with a syndicate of lenders ("the Lenders"). The Credit Agreement granted the Lenders a lien in substantially all of the Debtor's assets. On September 23, 2002 ("the Petition Date"), the Debtor (together with its affiliates) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. At that time, the Debtor owed the Lenders in excess of $120 million. As of the Petition Date, T & B had delivered goods to the Debtor under the Agreement in the amount of $5,502,391.74 for which T & B had not received payment. The Debtor had accumulated $879,861.19 in pre-petition credits under the Agreement and continued to accrue approximately $300,000 in post-petition credits as of October 29, 2002.

On September 30, 2002, T & B commenced an adversary proceeding against the Debtor seeking to reclaim $1,793,158.36 in goods delivered to the Debtor. The Lenders filed a motion to intervene in the adversary proceeding. Thereafter, the parties settled some of the issues by stipulating that T & B would honor $896,191 in credits earned by the Debtor on resales of goods for which the Debtor had paid T & B, and that T & B

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Rule 9014.

could recoup $622,540 against its pre-petition unsecured claim for credits earned by the Debtor on pre-petition resales of goods for which the Debtor had not paid T & B.

There remains at issue in this Motion $232,477 in credits accrued in the two months prior to the Petition Date in connection with the Debtor's resale of goods for which T & B had been paid. T & B seeks authority to setoff or recoup those credits against sums otherwise due prepetition by T & B to the Debtor. The parties have stipulated that the Lenders had a validly perfected security interest in all of the Debtor's accounts receivables and general intangibles as of May 1, 2002.

## II. *JURISDICTION*

This Court has jurisdiction over this Motion as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and (K).

## III. *DISCUSSION*

The issue presented by this Motion is whether T & B has the right to recoup or setoff amounts due to the Debtor for credits on goods already paid by the Debtor against amounts owed by the Debtor for other equipment purchased under the Agreement. The Debtor asserts that recoupment and setoff are not available and that, consequently, T & B must pay the Debtor for the credits due while its prepetition claim for equipment sold is entitled only to treatment as a general unsecured claim.

### A. *Setoff*

T & B argues that it has the right to set off the credits it owes the Debtor against its remaining pre-petition claim. The doctrine of setoff, preserved by section 553 of the Bankruptcy Code, provides

a creditor with the right "to offset a mutual debt owing by such creditor to the debtor" so long as both debts are in fact mutual and arise pre-petition. *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir.1992) (*quoting* 11 U.S.C. § 553(a)). Both debts in question arise pre-petition between the same parties (the Debtor and T & B).

In essence, the right of setoff "elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *University Med.*, 973 F.2d at 1079 (*quoting Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984)). However, under Tennessee law,[2] a creditor's setoff right is subordinate to a lender's security interest if the creditor received authenticated notice of that security interest. *See* Tenn. Code Ann. § 47–9–404(a)(2)(2003) (rights of assignee are subject to vendor's setoff rights that accrued prior to authenticated notice of the assignment of security interest).

#### 1. *Notice*

Similar to its predecessor (Uniform Commercial Code ("UCC") section 9–318), section 9–404 of Tennessee's version of the UCC states that the priority of a setoff right depends on the time of notification of a competing security interest. Tennessee law conforms to the generally accepted principle that the filing of a UCC–1 form asserting liens on accounts receivable is not notification to an account debtor of that lien. *USBI Co. v. Otha C. Jean & Assoc.*, 152 B.R. 219, 223 (Bankr. E.D.Tenn.1993). Instead, section 9–404 requires "notification of the assignment authenticated by the assignor or the as-

---

**2.** The Debtor argues that, because its principal place of business is in Pennsylvania, that state's law applies. However, this argument fails because section 24(f) of the Agreement provides for the application of Tennessee state law.

signee." Tenn.Code Ann. § 47–9–404(a)(2). Such notification can occur by providing actual notice or constructive notice. Tenn.Code Ann. § 47–1–201(25)(a)–(c). The UCC states that notification requires the taking of "such steps as may be reasonably required to inform the other in the ordinary course." Tenn.Code Ann. § 47–1–201(26). Receipt of notification occurs when "it is duly delivered at ... the place for receipt of such communications." Id. at § 47–1–201(26)(b).

T & B asserts that it never received actual or constructive notice from either the Debtor or the Lenders, as required by the Tennessee statute. T & B supports this contention by arguing that neither the Debtor nor the Lenders delivered actual notice to its place of business.

The Debtor asserts that T & B received notice of the Lenders' security interest when T & B's Director of Credit, Mr. Burks, downloaded a credit report of the Debtor with that information from Dunn and Bradstreet ("D & B"). T & B disputes this contention, however, asserting that no actual notice of the Lenders' lien was received. Mr. Burks of T & B testified that he was unable to read the May D & B report and that it was "lost" in T & B's computer system.[3] The Debtor asserts the Court should draw an adverse inference that the information contained in the report included the notification of the liens of the Lenders.

We agree with the Debtor that an adverse inference that the report contained notice of the Lenders' liens is warranted. See, e.g., Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc., 692 F.2d 214, 217 (1st Cir.1982) (where information is in one party's control and is not produced, a negative inference may be drawn

that the information is adverse to that party). "The inference depends ... on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them." Id. at 218.

We do not find credible Mr. Burks' assertion that he lost the report. Mr. Burks downloaded the report during the same period in which T & B was conducting a credit analysis of the Debtor to determine whether it was in compliance with the terms of the Agreement. It is not believable that, at the time he was checking the Debtor's credit, he lost the report and did nothing to obtain another copy from either his IT department or D & B. It was part of his job to get the report and monitor the Debtor's account. The report was relevant to that inquiry. Thus, the report was relevant at the time it was "lost." Consequently, we conclude that T & B received actual notice of the Lenders' lien on May 1, 2002, when it received a copy of the D & B report which reflected those liens.

### 2. Authentication

■ Under section 9–404(a)(2), the notice a party receives must be properly authenticated by the assignor or the assignee. According to the UCC, authenticate is defined as:

(A) to sign; or

(B) to execute or otherwise adopt a symbol, or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record.

Tenn.Code Ann. § 47–9–102(7).

T & B argues that it did not receive an authenticated notice because third party

---

**3.** Mr. Burks first testified that the computer files in which the report was located were destroyed. He then testified that he assumed

the files were lost because he never received a definitive answer from the IT department as to whether the files were recoverable.

private information providers, such as D & B, are not substitutes for the affirmative acts of signing or executing required of the assignee/assignor. The Debtor responds that a writing transmitted directly from a debtor or a secured party to an account debtor is not required to satisfy the authentication requirement of the statute.

There is no meaningful case law interpreting the authentication requirement of section 9–404(a) nor do the Comments shed any light on this issue. Under its predecessor (section 9–318), almost all notifications were deemed sufficient. Only bare constructive notice, such as that created by filing a UCC–1 financing statement, failed to constitute notification under section 9–318. *Compare Bank of Kansas v. Hutchinson Health Serv., Inc.,* 13 Kan. App.2d 421, 773 P.2d 660 (1989) (finding actual notice under section 9–318(b) even though not transmitted in the ordinary course of business, where party was named as defendant in suit); *In re Bancroft Dairy Inc.,* 10 B.R. 920 (Bankr. W.D.Mich.1981) (notice need not be tangible communication to account debtor) *with Otha C. Jean & Assoc.,* 152 B.R. at 219 (filing of financing statement in and of itself did not constitute sufficient notice of assignment); *Chase Manhattan Bank v. New York,* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 897, 357 N.E.2d 366 (1976) (paper filed with a state office solely as a commercial repository to give constructive notice to the world is not actual notice).

We agree that the addition of the authentication requirement in section 9–404 must mean that something more than actual or constructive notice is required. However, we do not go so far as T & B in concluding that it means actual delivery of a signed copy of the financing statement or some other formal notice. It makes no commercial sense to require a particular form of notification transmitted directly

from a debtor or a secured party to all account debtors. Such a requirement would be a tremendous change from the law as it existed under section 9–318. If that were mandated by section 9–404, the section and the Comments would have made that clear.

While the Official Comments do not provide guidance, we believe the definition of "authenticate" does shed some light on this issue. That definition expresses the goal of allowing notice by modern electronic means of delivery of information. Electronic delivery of documents is often unable to include original signatures and, instead, substitutes a symbol for those signatures. Subsection (B) of the definition of authenticate permits such electronic symbols to stand for the signature of a party.

Using this analysis, we conclude that the delivery of the D & B report to T & B, which included a statement that the Lenders had a lien in all accounts receivable, meets this requirement. Such reports are often relied upon by parties in determining whether such liens exist. In fact, Mr. Burks testified that T & B does rely on D & B's comprehensive reports for information about its customers. Therefore, we conclude that, having received authenticated notice of the Lenders' liens on May 1, 2002, T & B's right to setoff does not have priority over the Lenders' liens under section 9–404 of the UCC.

### B. *Recoupment*

■■ T & B asserts nonetheless that it has a right of recoupment. The doctrine of recoupment is an equitable remedy that allows the offset of mutual debts when the respective obligations originate from the same transaction or occurrence. *In re Telephone Warehouse, Inc.,* 259 B.R. 64, 67 (Bankr.Del.2001). The doctrine of recoupment is defined as "the setting up of a

demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *University Med.*, 973 F.2d at 1079 (*quoting* 4 COLLIER ON BANKRUPTCY § 553.03, at 553–15–17 (Lawrence P. King Ed., 15th ed.1992)). The Third Circuit explained:

> The doctrine is justified on the grounds that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable."

*University Med.*, 973 F.2d at 1079 (*quoting Lee v. Schweiker*, 739 F.2d at 875).

■■■ In the bankruptcy context, the application of recoupment is not codified in the Bankruptcy Code, but it has been developed through case law. *See Anes v. Dehart (In re Anes)*, 195 F.3d 177, 182 (3d Cir.1999). In bankruptcy cases, recoupment has often been applied where the relevant claims arise from a single contract "that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction." *University Med.*, 973 F.2d at 1080 (*quoting In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.1986)). "However, an express contractual right is not necessary to effect a recoupment. Nor does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment." *University Med.*, 973 F.2d at 1080. The simple "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims ... does not mean that the two arose from the 'same transaction.'" *Id.* at 1081 (*quoting Lee v. Schweiker*, 739 F.2d at 875). "Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *University Med.*, 973 F.2d at 1081.

■■■ T & B asserts that it has a right, under section 9–404(a)(1), to recoup the sums due to it from the Debtor against its pre-petition unsecured claim for the unpaid balance of goods delivered to the Debtor because they arose from the same integrated transaction, namely sales of equipment under the Agreement. *See* Tenn.Code Ann. § 47–9–404(a)(1). In support of this position, T & B argues that even though there were multiple sales of equipment, each sale originated under the Agreement and not under multiple contracts.

In contrast, the Debtor asserts that T & B has failed to establish that the sales credits at issue are related in any way to the sales transactions which gave rise to T & B's pre-petition claim. The Debtor argues that the sales credits at issue were generated in connection with equipment for which T & B has already been paid. The Debtor asserts there is no right of recoupment of those credits against any other equipment sales.

The Debtor's argument is facially appealing: just because the parties have a distribution contract does not mean that claims for the sale of one piece of equipment relate to claims arising from the sale of another piece of equipment. Although the Agreement did not expressly contemplate that the credit with respect to the sale of one piece of equipment was available against amounts due for other equipment sales, "there need not have been any express contractual right to withhold payments for the transaction to be recoup[ed]." *In re Holford*, 896 F.2d 176, 178 (5th Cir.1990).

In this case, the Agreement between the parties contemplated the sale of multiple pieces of equipment. The credits were earned only after the Debtor had sold the equipment to end users at less than the standard price. That sale typically occurred long after the Debtor had paid for the equipment. The credits were an integral part of the parties' overall relationship under the Agreement and the parties certainly intended that they be applied against future sales of equipment. If T & B were not permitted to recoup the sales credit against future equipment sales, that credit would be worthless. Thus, we conclude that the sales credits and equipment purchases are both part of a single integrated business transaction and are sufficiently related to one another to permit recoupment.

■ A right of recoupment, because it is a defense to sums due by the creditor, is not subordinate to the security interest that a lender may have in the debtor's inventory. Section 47–9–404(a)(1) provides that:

(a) ASSIGNEE'S RIGHTS SUBJECT TO TERMS, CLAIMS, AND DEFENSES; EXCEPTIONS. Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee [including a lender secured by inventory] are subject to:

(1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

(2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

Tenn.Code Ann. § 47–9–404(a)(1).

Therefore, we conclude that T & B has the right to recoup the sales credits against its pre-petition unsecured claim.

## IV. CONCLUSION

For the foregoing reasons, we determine that T & B may recoup the $232,277 sales credit against its pre-petition claim. Accordingly, we will grant the Motion to that extent.

An appropriate Order is attached.

### ORDER

AND NOW this **14th** day of **OCTOBER, 2003,** upon consideration of the Motion for Relief from Automatic Stay filed by Thomas & Betts Corporation and the opposition thereto by the Debtor, and for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion is **GRANTED;** and it is further

**ORDERED** that Thomas & Betts Corporation may recoup its sales credit against its pre-petition claim against the Debtor in the amount of $232,277.