## In re AMERICAN REMANUFACTURERS, INC., et al., Debtors.

Montague S. Claybrook, as Chapter 7 Trustee of the estates of American Remanufacturers, Inc., et al., Plaintiff,

v.

AutoZone Texas, L.P.; AutoZone, Inc., General Partner to AutoZone Texas, L.P.; and AutoZone Parts, Inc., Defendants.

Bankruptcy No. 05–20022 (PJW).

Adversary Nos. 07–51597 (PJW), 07–51603 (PJW).

United States Bankruptcy Court, D. Delaware.

June 9, 2011.

L. Jason Cornell, Sheldon K. Rennie, Fox Rothschild LLP, Wilmington, DE, Michael G. Menkowitz, Joshua T. Klein, Fox Rothschild LLP, Philadelphia, PA, Alan L. Frank, Alan L. Frank Law, Elkins Park, PA, for Montague S. Claybrook, Chapter 7 Trustee for the estates of American Remanufacturers, Inc., et al.

Michael R. Lastowski Sommer L. Ross, Duane Morris LLP, Wilmington, DE, Stephen W. Ragland, Kristen C. Wright, Russell E. Stair, Bass, Berry & Sims PLC, Memphis, TN, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PETER J. WALSH, Bankruptcy Judge.

This is the Court's findings of fact and conclusions of law following a two-day trial on April 4 and 5, 2011. Montague S. Claybrook ("Trustee"), as chapter 7 trustee of the estates of debtors American Remanufacturers, Inc. ("ARI"), ATSCO Products, Inc. ("ATSCO"), and Car Component Technologies, Inc. ("CCT") (collectively, the "Companies"), seeks to collect roughly $4.5 million in accounts receivable from defendants AutoZone Texas, L.P., AutoZone, Inc., and AutoZone Parts, Inc. (collectively, "AutoZone" or the "Defendants"). Trustee seeks to recover these accounts receivable under claims of breach of contract (Counts I–III), unjust enrichment (Count IV), quantum meruit (Count V), and turnover of estate property (Count VI). AutoZone concedes the amount of the accounts receivable, but it alleges that the Companies owe AutoZone credits that more than off-set these amounts due.

At trial, the Companies presented the testimony of the Trustee, Montague S. Claybrook, and Hugo H. Gravenhorst, the managing director of Black Diamond Commercial Finance, LLC. AutoZone presented the testimony of David Ingvardsen, former merchandising category manager for AutoZone; Phyllis Lynn Melton, an AutoZone supply chain manager; Cathy Meyer, AutoZone's then-Director of Accounts Payable; and it's expert witness Charles A. Riepenhoff, a Managing Director of KPMG LLP. For the reasons set forth below, I find for Defendants.

### FINDINGS OF FACT

The Companies were in the business of selling remanufactured automotive parts to retailers like AutoZone. (*See* Joint Pretrial Order, Doc. # 327 ("Pretrial Order") [1] , at ¶ 1.) The Companies collected damaged automotive parts (referred to as "cores") from retailers, which the Companies would then remanufacture and resell. (*Id.*)

AutoZone is a retailer in the business of selling automotive parts, including new and remanufactured replacement parts. (*See* Ingvardsen Tr. I 187:19–188:2.[2]) AutoZone is one of the largest such retailers,

---

[1] Citations herein to the Pretrial Order are to the numbered paragraphs contained in Section III of that Order, entitled "Admitted Facts That Require No Proof," which are "facts that are not disputed or have been agreed to or stipulated by the parties."

[2] Citations herein to "Tr." are to the trial transcript, Doc. # 333–334, with reference to the witness providing the cited testimony. Citations to "Tr. I" and "Tr. II" refer to the first and second day of testimony, respectively. Trial exhibits cited herein are identified as "P-[# ]" and "D-[# ]," indicating exhibits introduced by Plaintiff and Defendant, respectively.

with over 4,000 retail stores. (Ingvardsen Tr. I. 188:4, 258:12–15.)

Prior to their liquidation, the Companies routinely supplied AutoZone with remanufactured parts for sale in AutoZone's retail stores. (*See* Ingvardsen Tr. I 188:25–189:2, 189:19–190:14.) The Companies generally would send remanufactured parts to one of AutoZone's eight distribution centers ("DCs") throughout the United States. (Melton Tr. II 122:5–14). Products would then be sent out to the retail stores. When the retail stores had products to return to the Companies (as described more fully below), the products would again pass through one of these DCs. (*Id.* 122:18–24.) ARI, because it provided custom-ordered goods, sent product directly to the retail stores (Melton Tr. II. 129:23–24); however, returns to ARI would be channeled back through the DCs. (*Id.* 129:6–8.)

AutoZone's Supply Chain Manager, Melton, described the constant flow of goods going through the DCs, testifying that AutoZone "received shipments from ATSCO and CCT every week, and some DCs two to three truck loads a week" (Melton Tr. II. 129:21–23) and that some DCs were "sending back one to three truckloads a week back to ATSCO and CCT," with a lower volume being shipped back to ARI. (Melton Tr. II. 128:18–24.)

The Companies filed their Chapter 11 bankruptcy petitions on November 7, 2005 (the "Petition Date"). They operated as debtors-in-possession until November 17, 2005 (the "Conversion Date"), when their cases were converted to Chapter 7 cases and Claybrook was appointed Trustee. (Pretrial Order ¶¶ 10, 12.)

The Companies ceased operations on the Conversion Date. (Pretrial Order ¶ 13.) AutoZone had no notice that the Companies had filed bankruptcy or stopped doing business until they actually closed. (*See*

Melton Tr. I 25:11–15; Melton Tr. II 130:4–16; Ingvardsen Tr. I 218:2–9.)

*The Core Purchase and Return Cycle*

AutoZone and the Companies maintained a longstanding course of dealing pursuant to contracts whereby AutoZone would purchase remanufactured parts from the Companies and sell those parts to its customers; the customers would bring the broken part (the core) from their vehicles to AutoZone for a partial refund; AutoZone would send the cores to the Companies for credit; and the Companies would remanufacture them and sell the remanufactured parts. (*See* Ingvardsen Tr. I 233:4–10, 209:14–23, 191:11–192:11; Pretrial Order, ¶ 40.)

When AutoZone purchased remanufactured parts from the Companies, it paid them a predetermined "item cost" plus a "core cost" for each product. (*See id.* at 192:15–193:1, 193:11–14; Melton Tr. II 126:11–127:20; D–10.) The item cost was the cost of the product. The core cost was an additional charge AutoZone paid over and above the item cost, representing the value of the product's remanufacturing potential. (*See* Ingvardsen Tr. I 193:2–5, 264:23–265:1.)

AutoZone recoups the core cost in one of two ways. Initially, the core cost is passed on to the consumer as a component of the product price. If the customer never returns a core, AutoZone has recouped the core cost directly from its customer. (*See id.* at 193:15–22.) If, instead, the customer returns a core to AutoZone, as usually happens contemporaneously with or shortly after the customer's purchase of a remanufactured part, AutoZone refunds the core cost to the customer and ships the cores back to the Companies for credit against its open invoices. (*See id.* at 193:23–194:1, 194:9–12.) AutoZone's return of cores for credit against its pur-

chases is therefore a recoupment of the core cost, *i.e.*, the overpayment made in AutoZone's original purchase of the product. (*See id.* at 220:10–14, 266:5–17.)

AutoZone's return of cores to the Companies for credit was part of an ongoing process central to the relationship between AutoZone and the Companies:

> It was a purchase, a sale to a customer, return from a customer, and then a return of the core back to the supplier. So I mean, it was ongoing.... It really is a total flow of how our business continued to revolve.

(*See id.* at 233:4–10.) AutoZone's then-merchandising category manager, Ingvardsen, also testified:

> Once again, it's really about the lifecycle of the product. We buy that product that—it has the ability to be remanufactured, we sell it to a customer that needs it when it breaks. The customer brings back the broken item, the broken axle, we would return it back to the remanufacturer. And the remanufacturer, they needed the cores to be able to go back and rebuild. So it was all a part of that process.

(*See* Ingvardsen Tr. I 220:3–9.)

For each of AutoZone's purchases, the parties understood that AutoZone would ordinarily return a different core to the Companies for credit:

> So, you are talking about the core[s that are] being returned back to CCT. At that very same time, there is a truck going in the other direction with more products that we've paid core values for, that eventually we're going to return back to CCT, they're going to issue a credit for and they're going to rebuild and that's just one continuous buying and returning process.

(Ingvardsen Tr. I 262:1–7; *see also* Meyer Tr. II 25:16–18 ("[E]very time you bought something, you knew that eventually there was going to be a return of that core at some point.").)

AutoZone's entitlement to credit for returns was integral to the parties' relationship. (*See* Ingvardsen Tr. I 219:3–20; Riepenhoff Tr. II 182:24–183:10.) Cores had no retail value to AutoZone other than their value as credits against AutoZone's purchases from the Companies, and AutoZone's receipt of those credits was integral because it allowed AutoZone to recoup core costs that AutoZone had already paid. (*See* Ingvardsen Tr. I 221:12–222:6, 222:10–15.) Ingvardsen testified that the application of credits from returns and allowances under the vendor agreements was "extremely important and it was a part of the process. So we'd paid for the item in the beginning and paid for a core value. And so that returns to get the credits for the cores that were going back, that was just a closing of the loop of that product." (*Id.* at 219:16–20.) Debtor's expert, Riepenhoff, likewise testified that purchasing product from the companies and then returning cores for credits "was a continuing loop. It was business that was going on all the time." (Riepenhoff Tr. II 176:2–20.)

*The Vendor Agreements*

The Companies' supply relationship with AutoZone was governed by three vendor agreements. (*See* Pretrial Order ¶¶ 5–7.) One agreement was between debtor ARI and AutoZone Texas, LP, dated October 17, 2000 (the "ARI Vendor Agreement"). (P–18.) A second was between debtor ATSCO Products and AutoZone Parts, Inc., dated June 9, 2004 (the "ATSCO Vendor Agreement"). (P–17.) And the third was between debtor CCT and AutoZone Parts, Inc., dated February 6, 2004 (the "CCT Vendor Agreement"). (P–15.) There was an addendum to the CCT Vendor Agreement, dated August 26, 2004 (the "Core

Devaluation Addendum" or "CDA"). (P–16.) Collectively, these three vendor agreement, including the CDA, will be referred to as the "Vendor Agreements."

Ingvardsen testified about the terms of the Vendor Agreements and the parties' course of dealing. (*See* Ingvardsen Tr. I 196:2–209:7.) He has worked for AutoZone for fifteen years and he is experienced with AutoZone's vendor agreements and their terms. (*See id.* at 187:16–18; 194:13–25.) Ingvardsen interacted directly with CCT, worked on AutoZone's buying team for ATSCO and ARI, and was familiar with AutoZone's dealings and agreements with all three Companies. (*See id.* at 188:20–24, 189:19–25, 190:4–14, 227:3–5.) He was a credible witness with personal knowledge of the parties' agreements and their course of dealing.

The Vendor Agreements specify AutoZone's payment terms and do not require AutoZone to pay interest. (*See* P–15; P–16; P–17; P–18.) They also require the Companies to pay for all freight for the shipment of products and returns between AutoZone and the Companies. (P–15, P–17, P–18, at pp. 3–4; *see also* Ingvardsen Tr. I 196:23–197:15, 199:6–9, 205:6–8, 208:20–22; Meyer Tr. II 51:7–16.)

The Vendor Agreements also provide that AutoZone is entitled to certain credits and deductions against its purchases. The Trustee readily acknowledges that "[p]ursuant to the [Vendor] Agreements, AutoZone was entitled to off-set amounts owed to ARI, CCT, and ATSCO by amounts it was owed for Core Returns, Returns of Goods and other various credits and rebates." (Adv.Proc. 07–51603, Doc. # 1, ¶ 37.) AutoZone's witnesses further detailed the terms of these Agreements.

(a) Under each Agreement, AutoZone is entitled to monthly promotional allowances. (P–15, P–17, P–18, at p. 2; *see also* Ingvardsen Tr. I 196:2–22, 202:22–203:14, 206:21–207:12.) AutoZone is entitled to deduct fill rate penalties when the Companies failed to fill AutoZone's purchase orders to a certain level. (P–15, P–17, P–18, at p. 3; *see also* Ingvardsen Tr. I 197:1–5; Meyer Tr. II 42:13–22.) AutoZone is also entitled to deduct for warranty claims it pays to customers relating to the Companies' products. (P–15, P–17, P–18, at p. 6; *see also* Ingvardsen Tr. I 200:9–16; Meyer Tr. II 45:18–46:10.)

(b) The Vendor Agreements also govern AutoZone's returns to the Companies, which consisted of (1) damaged returns, (2) undamaged returns, and (3) cores (collectively, "Returns"). (P–15, P–17, P–18, at p. 4; *see also* Meyer Tr. II 10:23–11:6. ("we call them all returns").) Damaged returns were products that were broken or damaged. (*See* Meyer Tr. I 66:13–16; Meyer Tr. II 10:18–21.) Undamaged returns were products that were undamaged but were returned by the customer for any reason. (*See id.* 10:13–17.) Core returns were broken parts collected from customers and returned to the Companies for remanufacturing. (*See* Ingvardsen Tr. I 190:23–191:1.)

(c) Throughout the parties' relationship, all types of Returns were processed in the same way and treated the same for accounting purposes and for determining remittance amounts. (*See* Meyer Tr. I 108:24–109:6 ("Cores were not any different from other items. They were all returns."); Ingvardsen Tr. I 238:15–21; Melton Tr. I 16:14–21; Melton Tr. II 123:16–23, 126:11–127:23; Meyer Tr. II 10:13–11:6, 25:10–18.) The Vendor Agreements provide that AutoZone is entitled to credit for Returns at "current invoice price," which were predetermined, negotiated prices for items agreed to by the parties (the "Current Invoice Prices"). (P–15, P–17, P–18, at p. 4; Pretrial Order ¶ 24; *See* Ingvardsen Tr. I 199:16–22.)

(d) Per the Vendor Agreements, Auto-Zone made Returns to the Companies without any prior authorization, and the Companies were obligated to accept them and provide credit. (P–15, P–17, P–18, at p. 4; *see also* Ingvardsen Tr. I 198:16–199:15, 204:17–24, 207:24–208:9.) Under the ARI and ATSCO Vendor Agreements, AutoZone had "open return privileges," meaning that AutoZone was not required to obtain a "Return Goods Authorization" ("RGA") to send Returns back for credit at Current Invoice Prices. (P–17, P–18, at p. 4; *see* Ingvardsen Tr. I 199:23–200:8, 205:9–206:11; Melton Tr. I 23:1–24, 27:14–23.) The CCT Vendor Agreement provides that AutoZone had a permanent RGA, which is the same as having open returns privileges. (P–15, at p. 4; *see* Ingvardsen Tr. I 208:23–209:3; Melton Tr. I 29:4–14.)

**Core Devaluation Addendum**

Pursuant to the Core Devaluation Addendum, the parties agreed to a "core devaluation" to allow AutoZone to recoup excess core costs that AutoZone had previously paid to CCT for axles whose cores had since declined in value. (*See id.* at 210:4–13, 213:8–21.) Under the CDA, CCT was required to provide AutoZone with a credit against its open items in the aggregate amount of $5,000,000.00, plus interest (the "Core Devaluation Credit"). (Pretrial Order ¶ 28; P–16; *see* Riepenhoff Tr. II 186:12–21.)

Agreements to devalue cores are standard in the automotive aftermarket industry. (*See* Ingvardsen Tr. I 250:18–21.) The purpose is to reduce the value of cores being carried on a retailer's books when the true value of those cores has fallen substantially below the original "core cost" the retailer paid to the remanufacturer. (*See id.* at 210:4–13.) Absent devaluation, the retailer will incur a loss each time a core is returned because the credit the

vendor issues-based on current core values—is substantially less than the core cost that the retailer originally paid to the vendor and is carrying on its books. (*See id.* at 214:16–22.) As Ingvardsen testified:

> If we didn't devalue our inventory, we would have paid $75 for that core. And then when we would have sent it back to CCT, they would have issued a credit in the amount of $25. So we have actually—would have overpaid by $50. So devaluation needs to happen so that the item that we send back to this—the remanufacturer, in this case CCT, was really what it was truly worth . . .

(*Id.*)

The Core Devaluation Credit amount of $5 million was mutually agreed upon by the parties. (*See id.* at 215:11–21; P–16.) AutoZone agreed to receive the Credit in monthly installments of $145,406 beginning September 1, 2004, deducted in the first remittance of each month to CCT until Conversion. (*See* P–16, ¶ 2; Pretrial Order ¶ 29; Ingvardsen Tr. I 216:15–25; Meyer Tr. II 27:14–28:24; Riepenhoff Tr. II 186:12–187:19.)

AutoZone demonstrated at trial that all conditions precedent to the Companies' obligation to issue the Core Devaluation Credits under the CDA were satisfied. (*See, e.g.,* P–16, ¶ 2; Meyer Tr. II 82:25–83:4, 84:13–85:12; P–29 (credit amount never exceeded 7% of AutoZone's net axle purchases from CCT as required by ¶ 2 of the CDA).) Plaintiff did not introduce any contrary evidence at trial.

**The Parties' Course of Dealing**

AutoZone's purchases of products from and Returns to the Companies were well documented with purchase orders, receiving documents, invoices, and bills of lading. (*See* Meyer Tr. II 7:2–8:14, 9:2–15, 11:11–16; Melton Tr. II 125:3–126:10; D–10; Riepenhoff Tr. II 177:3–10.) AutoZone

and the Companies exchanged information regarding purchases and returns electronically through a system called Electronic Data Interchange. (Meyer Tr. II 7:10–21.) Purchases orders, invoices and other inventory information were all exchanged electronically and stored in a database. (*Id.*) Meyer testified that AutoZone's database containing all the information exchanged with the Companies over the years of their relationship "exceed[ed] 14 gigabytes of data, hundreds of thousands of pages." (Meyer Tr. II. 12:13–14.)

AutoZone tracked invoices received for products purchased from the Companies by recording each unpaid invoice as an "open item" in its accounts payable system. (*See* Meyer Tr. II 15:9–10.) AutoZone also recorded credits for allowances, Returns, and other amounts owed as open items in its accounts payable system in the ordinary course of business. As Meyer testified:

> So for allowance deductions, advertising allowance, promotional allowance, those kinds of things, AutoZone created an invoice to the vendor that detailed what the deduction was for, and so those documents and any other, you know, support for that—and there are many screens from our accounts payable screen for the items that are in open items, you know, the images associated to support those items that are in open items.

(*See* Meyer Tr. II 12:1–8.)

For Returns, AutoZone would record the credit as an open item in accounts payable upon shipment. (*See id.* at 24:14–18; Ingvardsen Tr. I 261:2–4.) Receipt of a credit memo from the Companies did not always occur and was not necessary for AutoZone to deduct Return credit from remittances. (*See* Meyer Tr. II 10:8–11:24.) In the ordinary course of the parties' business, AutoZone did not pay the Companies the gross amount of open invoices in its accounts payable system; rather, AutoZone would determine the amount of periodic payments by "netting" all outstanding invoices against all outstanding credits that were owed between the parties at that time. (*See* Riepenhoff Tr. II 176:21–177:25, 184:2–8; Meyer Tr. II 14:11–19, 16:9–16, 34:8–35:7; Ingvardsen Tr. I 200:17–201:3; P–15, P–17, P–18, at p. 7, ¶ 5.) For example, Meyer illustrated that AutoZone made a payment of $106,000 to CCT on August 31, 2005 which was the result of netting out about 200 pages of invoice and credit items. (Meyer Tr. II. 20:23–21:11; D5.)

AutoZone utilized two payment methods for its vendors—"direct pay" or the "Supplier Confirmed Receivables" ("SCR") program. (*See* Meyer Tr. II 12:25–13:11.) ARI was a direct pay vendor, and ATSCO and CCT were on the SCR program, under which AutoZone has longer payment terms, but the vendor arranges with a bank to be paid a discounted amount by the bank much sooner. (*See id.* at 13:8–16, 14:21–15:7; Ingvardsen Tr. I 203:24–204:13.)

With regard to ARI, a "direct pay" vendor, every night AutoZone's accounts payable system would automatically review all open items in accounts payable to identify any invoices or credits that were due on or before that date. Any such items were then netted to arrive at a net position between AutoZone and ARI. If the total was a positive number, a single net payment would be made to ARI. If the total was a negative number, ARI was in "credit balance" and owed credit to AutoZone, so no payment was made on that day. (*See* Meyer Tr. II 13:17–14:19, 35:21–36:13, 39:3–8.)

Under the SCR program, a determination was made on a weekly basis as to whether a payment would be made to AT-

SCO or CCT. Each week, AutoZone's accounts payable system would evaluate the total position for each vendor, including all open items and any items that were still in process—*i.e.,* items that had not yet been posted as open items. AutoZone then determined the largest amount it could pay on a particular date after netting out all invoices against all credits. If the calculation produced a positive number, AutoZone sent payment to the vendor's bank as a single remittance. If a negative number resulted, the vendor was in credit balance and no payment would be made for that week. (*See id.* at 14:21–16:20, 29:20–30:5; Ingvardsen Tr. I 203:24–204:13.)

Thus, whether paid directly or in the SCR program, all AutoZone's purchases from each Company and all amounts each Company owed to AutoZone for credits under the Vendor Agreements were routinely netted out against each other to determine the amount of each periodic remittance. (*See* Meyer Tr. II 14:11–19, 16:9–16, 34:8–35:7.) The Companies never made cash payments to AutoZone for any deductions or credits owed to AutoZone; they were always netted against outstanding invoices for a periodic remittance. (*See id.* at 30:6–31:13.)

AutoZone proved that making separate remittances for each invoice would be extremely cumbersome and impractical as it would have resulted in hundreds of individual payments. Paying invoices on an individual basis would have also made it impossible for AutoZone to receive the credit it was entitled to because it could not have been properly deducted. (*See id.* at 30:6–18.) In the ordinary course of business, AutoZone received credit for Returns without regard to whether the particular items being returned could be "matched" back to a prior invoice. Rather, deductions for Returns were entered into Auto-Zone's system as open items and were netted against all other open items for periodic remittances. (*See id.* at 63:10–65:3, 27:4–24; Ingvardsen Tr. I 220:15–18; Riepenhoff Tr. II 186:12–187:19.)

Matching particular Returns to a corresponding open invoice would have been illogical, if not impossible, in light of the nature of the Companies' business:

> [W]e could've bought a product, you know, five or ten years ago, it could be sitting on a shelf, we could have sold it to a customer, they could've done the repair, finish the repair, put the core in the, you know, corner of the garage for whatever period of time that it takes for them to bring that back to get a refund of the core fee that they paid and then for us to send it back to the remanufacturer to get the actual credit for those cores. So it could be an extremely long period of time.

(Ingvardsen Tr. I 220:24–221:7; *see also id.* at 258:22–259:20; Meyer Tr. II 24:19–25:9.) Such a time lag between purchases and returns is typical in the industry. (*See* Ingvardsen Tr. I 217:1–16.) In addition, the products are not individually identified or tracked by a serial number or tag number. (*See* Meyer Tr. II 63:24–65:3, 111:7–24; Riepenhoff Tr. II 177:3–16 ("There's not a specific identification method ... It's like a revolving door; it's always going around all the time. And so matching those would be almost impossible.").)

Credits for allowances, freight, and other deductions were also not linked to a particular purchase. Rather, deductions were entered into AutoZone's accounts payable system and netted with all other open items. (*See* Meyer Tr. II 26:19–27:24.)

### AutoZone's Accounts Payable Records

For each of the Companies, AutoZone produced a report from its accounts payable system listing all open invoices and all

outstanding credits for allowances, Returns, and other deductions that are owed between the parties under the Vendor Agreements (collectively, the "Open Items Reports"). (*See* Meyer Tr. II 18:21–19:17; P–3; P–4; P–5.) The parties stipulated to admissibility of the Open Items Reports. (Pretrial Order ¶ 23.)

Meyer testified that each of the items reflected in the Open Items Reports is supported by underlying documentation, all of which was produced to Plaintiff through discovery. (*See* Meyer Tr. II 12:9–24, 39:18–40:5, 44:14–21, 77:17–21.) The Open Items Reports were admitted into evidence under Rule 1006 as summaries of AutoZone's voluminous business records, and samples of the underlying business records were examined during trial to demonstrate how the Reports were generated and the underlying data upon which they are based. (*See* Meyer Tr. II 39:18–55:12; P–3; P–4; P–5; D–7; D–8; D–9; D–10.) AutoZone's underlying business records are thorough, reliable, and support the items in the Open Items Reports.

AutoZone's expert, Riepenhoff, also evaluated the data underlying the Open Items Reports. (*See* Riepenhoff Tr. II 180:1–181:2; P–19.) Riepenhoff directed a team of six KPMG forensic accounting specialists who spent a week on-site at AutoZone's headquarters in Memphis, Tennessee, obtaining, reviewing, and sampling AutoZone's business records. Riepenhoff and his team then analyzed and reviewed AutoZone's data and determined it to be reliable and accurate. (*See* Riepenhoff Tr. II 173:13–175:2, 180:1–181:2, 208:3–14; P–19.)

Meyer was a credible witness at trial. Riepenhoff was well-qualified as an expert in forensic accounting, and his testimony was also credible. Plaintiff did not offer any evidence at trial either contradicting or challenging the Open Items Reports,

and in fact Plaintiff accepted and stipulated to AutoZone's outstanding accounts payable balance reflected in the Open Items Reports as the *gross* amount of accounts receivable owed to the Companies, without any credits applied. (*See* Pretrial Order, ¶ 22.) The testimony of Meyer and Riepenhoff, as well as the supporting documentation introduced by AutoZone, establish that AutoZone's records accurately reflect the gross amounts due between the parties per the Vendor Agreements.

**The Amounts Currently Outstanding Between the Parties**

Until the Conversion Date, AutoZone and the Companies continued to operate in the ordinary course of business consistent with their past business practices. (*See* Melton Tr. II 130:4–20.) Shipments of products and Returns continued to be made in accordance with the Vendor Agreements until the Companies closed and refused to accept any more shipments. (*See* Melton Tr. II 128:15–24, 129:19–130:3, 130:4–20.)

The Open Items Reports reflect the current net positions of the parties, taking into account all open invoices and all amounts owed to AutoZone that have been posted into the accounts payable system. (*See* P–3; P–4; P–5; Meyer Tr. II 39:18–40:5.)

As reflected in the Open Items Reports and as stipulated by the parties, the gross balance owed by AutoZone to the Companies for unpaid invoices is $4,557,476, consisting of $133,822 owed to ARI, $2,737,611 owed to CCT, and $1,686,043 owed to ATSCO. (*See* Pretrial Order ¶ 22; Exhibit P–3, P–4, P–5; Meyer Tr. II 56:25–58:8, 60:19–61:21, 65:4–19, 85:19–86:9.)

**Contractual Credits Owed to AutoZone for Allowances, Claims, Fill Rate Penalties, and Freight (the "*Non–Return Credits*"): $ 196,284**

The proof at trial was that the Companies owe AutoZone the following credits

pertaining to allowances and deductions under the Vendor Agreements:

| Non–Return Credits | | | | |
| --- | --- | --- | --- | --- |
| | ARI | CCT | ATSCO | Total |
| Allowances | $382 | $ 44,081 | $11,789 | $ 56,252 |
| Claims | | $ 3,566 | $ 3,929 | $ 7,495 |
| Fill Rate Penalties | | $123,355 | | $123,355 |
| Freight | $415 | | $ 8,767 | $ 9,182 |
| Total Non–Return Credits | $797 | $171,002 | $24,485 | $196,284 |

(See P–3; P–4; P–5; P–15; P–17; P–18; P–19; D–6; D–7; D–8; D–9; Meyer Tr. II 40:3–13, 41:23–42:12, 42:23–55:6; Riepenhoff Tr. II 183:11–185:13.)

## Credits Owed to AutoZone for Returns: $ 5,180,547

The proof at trial was that the Companies owe AutoZone the following credits for Returns under the Vendor Agreements at Current Invoice Prices:

| Return Credits | | | |
| --- | --- | --- | --- |
| | CCT | ATSCO | Total |
| Accepted Returns | $1,278,772 | $ 272,186 | $1,550,958 |
| Rejected Returns | $2,502,183 | $1,127,406 | $3,629,589 |
| Total Return Credits | $3,780,955 | $1,399,592 | $5,180,547 |

(*See* P–3; P–4; P–18; P–19; D–6; Meyer Tr. II 66:6–17; 71:7–12; 73:2–3; Riepenhoff Tr. II 183:11–185:13).

The Accepted Returns are Returns that AutoZone shipped and the Companies actually accepted on or before the Conversion Date. (*See* Meyer Tr. II 66:11–17, 66:24–67:9, 68:19–24, 87:15–19; P–3; P–4; P–19, at p. 18; D–6; D–10.)

The Rejected Returns include shipments of Returns that were en route to the Companies from AutoZone as of the Conversion Date. (*See* Ingvardsen Tr. I 218:10–18; Melton Tr. II 130:4–13, 131:2–12; Riepenhoff Tr. II 188:10–23.) Freight car-

riers handling the shipments on or around the Conversion Date advised AutoZone's *DCs* that the Companies' facilities were closed and deliveries could not be completed. These Returns were therefore re-routed to AutoZone's DCs. (*See* Melton Tr. II 130:4–13, 130:21–131:18, 132:18–21; Riepenhoff Tr. II 188:10–23.)

The Rejected Returns also include additional Returns that accumulated at AutoZone's DCs for shipment to the Companies before and after the Conversion Date and that were not shipped. (*See* Melton Tr. I 49:10–16; Melton Tr. II 130:21–131:1, 136:6–10; Meyer Tr. II 70:11–20.) Per the Vendor Agreements, AutoZone was not required to obtain prior authorization from the Companies to make Returns; thus the Companies were required to accept these Returns. (*See* Meyer Tr. II 70:21–71:10; Melton Tr. II 136:11–19.) Because the Companies had closed, they failed to accept the Rejected Returns in accordance with their obligation under the Vendor Agreements. (*See* Meyer Tr. II 70:21–71:10; Pretrial Order ¶¶ 30, 32, 34; Melton Tr. II 130:4–131:1.)

AutoZone's Supply Chain Manager, Melton, testified about the course of dealing between the parties with regard to logistics, freight, and the storage and disposition of the Rejected Returns. (*See* Melton Tr. II 130:4–13, 130:21–131:18, 132:18–21, 147:18–148:11, 148:19–149:1.) Melton was a credible witness at trial.

The evidence presented by AutoZone included a detailed inventory prepared by Melton of all of the part numbers and quantities of the Rejected Returns being stored by AutoZone, which inventory was prepared at the request of the Trustee, as well as photographs that AutoZone took of the Rejected Returns which were provided to the Trustee in advance of his inspection of the goods in May of 2008. (*See id.* at

137:19–139:19, 142:15–143:3; 147:2–6; D–18–D–21.)

AutoZone had no use for the Rejected Returns in its business. AutoZone is not in the business of selling cores, and cores have no retail value to AutoZone. (See Ingvardsen Tr. I 222:3–15.) AutoZone made efforts through its merchandising group to find a buyer for the Rejected Returns, but those efforts were unsuccessful. The Trustee eventually abandoned the interest he had asserted in the Rejected Returns, and AutoZone was given permission to sell the Rejected Returns as scrap metal for $40,081. (See Melton Tr. II 147:18–148:11, 148:19–149:1; Pretrial Order ¶¶ 38, 39.)

### Core Devaluation Credits Owed to AutoZone: $ 3,398,484

The evidence presented at trial demonstrates that AutoZone is also owed a total of $3,398,484 in credit under the CDA. Of this amount, $436,218 is reflected in the Open Items Report for CCT as "POS Inventory," which reflects deductions for the monthly Core Devaluation Credit for December 2005 and January and February 2006. In the ordinary course of business, these monthly Credits would be netted with all other open items to result in a remittance to CCT. (See P–3; D–6; Meyer Tr. II 79:13–80:15.)

AutoZone also introduced a deduction schedule reflecting the remaining $2,962,266 balance owing on the CDA, which amount had not yet been entered into its accounts payable system but is outstanding. (See D–2; Meyer Tr. II 81:1–18.)

The Plaintiff did not introduce any contrary evidence as to the amount of the Core Devaluation Credit due and owing to AutoZone. The Companies also admit in their original Schedule F, verified under oath on February 23, 2006, that they owe AutoZone the accelerated balance of the CDA as a non-contingent, liquidated, undisputed claim. (See Claybrook Tr. I 139:3–12, 141:11–142:2, 142:22–143:20; D–22; Pretrial Order ¶ 42.)

The proof at trial was that the Trustee had notice that AutoZone claimed the accelerated balance of the CDA against the receivables balance. (See Ingvardsen Tr. I 254:9–12; Claybrook Tr. I 128:22–129:22, 133:2–6; P–3; D–25; Pretrial Order ¶¶ 14–17.) The Trustee's collection agent, Apex Financial Management, LLC ("Apex"), also admitted as of July 24, 2006, that the accelerated balance of the CDA is an applicable credit against the total gross accounts receivable for the Companies. (See Claybrook Tr. I 133:18–135:11; D–27; Pretrial Order ¶¶ 14–17.)

### Amounts Owed to AutoZone for Freight Settlements: $ 184,500

Though the Companies were required to pay for all inbound and return freight for shipments sent to and from AutoZone (see P–15; P–17; P–18; Melton Tr. 131:13–18), they failed to pay freight on certain shipments to or from AutoZone around the time of the Conversion Date. (See Melton Tr. II 131:13–18, 132:18–21, 133:7–134:16.) Freight carriers made demand upon AutoZone for payment of that freight. (See Melton Tr. II 130:4–13, 130:21–131:18, 132:18–21; Riepenhoff Tr. II 188:10–23.)

AutoZone reached settlements with the freight carriers related to the freight charges, paying a total of $184,500 to the freight carriers due to the Companies' failure to pay them (the "Freight Settlement"). (See Melton Tr. II 133:7–134:16, 135:18–136:5; Riepenhoff Tr. II 188:24–189:7; D–6; P–19, at p. 19–20.)

### Amounts Owed to AutoZone for Storage Costs: $ 43,875

The Trustee's collection agents demanded "full and unfettered access to inspect the cores." (D–29, p. 5.) AutoZone stored

the Rejected Returns and understood that the Trustee wanted to inspect them to determine what the estate wanted to do with them. (*See* Claybrook Tr. I 153:4–13; D–29; D–30.) AutoZone provided the Trustee with addresses and dates on which he could inspect the Rejected Returns at the DCs as his agent demanded. Despite his demands, the Trustee did not attempt to inspect the Rejected Returns on any of those dates or send someone to inspect the Rejected Returns until May of 2008. (*See* Melton Tr. II 145:17–147:10; Claybrook Tr. I 153:4–12; D–29; Pretrial Order ¶¶ 33, 35, 36.)

The volume of Rejected Returns was large and occupied a significant amount of space in AutoZone's DCs. AutoZone stored the Rejected Returns in its DCs and in rented trailers and a leased storage facility for more than two years. (*See* Melton Tr. II 136:20–137:18; Pretrial Order ¶ 37.) The leased storage facility was approximately 65,000 square feet, with a monthly rent of $12,188. AutoZone used approximately 15% of that space for storing the Rejected Returns for 24 months, resulting in storage costs incurred by AutoZone of $43,875. (*See* Riepenhoff Tr. II 189:8–190:2; P–19, at p. 19–20; D–6.)

**Total Net Credits Due to AutoZone: *$4,446,214***

Against the total gross open accounts arising from AutoZone's purchases in the amount of $4,557,476, total credits of $9,003,690 are due to AutoZone from the Companies. Trial Exhibit D–6 accurately summarizes the evidence and the testimony as to the total amount of credits owed to AutoZone against the gross accounts receivable:

| Credit | Amount |
|---|---|
| Allowances | $56,252 |
| Fill Rate Penalties | $123,355 |
| Customer/Warranty Claims | $7,495 |
| Freight | $9,182 |
| POS Inventory (3 mos. Core Devaluation) | $436,218 |
| Accepted Returns | $1,550,958 |
| Rejected Returns | $3,629,589 |
| Freight Settlement | $184,500 |
| Storage | $43,875 |
| Core Devaluation Balance | $2,962,266 |
| Total Credit Owed AutoZone | $9,003,690 |

(*See* D–6; *see also* P–19.) The Trustee presented no proof to refute or contradict AutoZone's evidence as to the nature, amount, validity, or applicability of any of the credits owing against the accounts receivable.

When outstanding total credits are applied against total invoices on a consolidated basis, AutoZone owes the Companies nothing. (*See* Riepenhoff Tr. II 191:19–192:19; P–19, at p. 27.)

**The Common Pool of Assets and Liabilities**

The ten Debtors, including the Companies, have been administered at all times as a single entity, with no distinction between the assets, liabilities, creditors, distributions, or accounts of each entity. (*See* Claybrook Tr. I 143:1–20, 156:6–158:2; D–22.) All of the assets of all of the Debtors, including the Companies, were included on a single set of statements and schedules as assets of ARI and are administered as property of the ARI bankruptcy case. (*See* Claybrook Tr. I 113:10–16, 138:24–139:15; D–22; Pretrial Order ¶ 41.) The financial accounts of the Debtors were consolidated pre-petition and remain consolidated post-petition. (*See* Claybrook Tr. I 139:16–140:2, 141:2–10, 156:6–24; D–22.) The respective Debtors "didn't have the ability to create individual financial statements for each entity." (*See* Claybrook Tr. I 156:6–24.) The Trustee maintains one bank account for all expenses and recoveries related to the Companies and has made no effort to segregate expenses incurred or recovery obtained by any one

Debtor. (*See id.* at 157:3–158:12.) The Trustee testified that "all monies are going into that account and all monies are dispersed out of that one account." (*Id.* at 157:17–18.) The Trustee's collection agent demanded a single payment from Auto-Zone for the alleged accounts receivable claim to be wired to a single account. (*See* D–27.)

For the past five years, all collections for any adversary proceeding on behalf of any of the respective Companies are paid into a single bank account and are not segregated for distribution to creditors of any other of the Debtors. (*See* Claybrook Tr. I 143:1–16, 156:25–158:12; D–22; D–27.) Even Black Diamond, the Debtors' secured lender with a 95% interest in this action, filed only a single proof of claim in the Chapter 7 case for the debt owed by each respective Debtor, though the Court's order for joint administration ordered that a separate proof of claim should be filed under the case number of the Debtor with which that claim is associated, and not in the jointly administered estate. (*See* Gravenhorst Tr. I 183:6–185:9; Claybrook Tr. I 113:20–24; Pretrial Order ¶¶ 18, 19; Case. No. 05–20022, Doc. # 34.)

### CONCLUSIONS OF LAW

### Jurisdiction, Venue, and Applicable Law

The jurisdiction of and venue in the Court is not disputed. Jurisdiction arises under 28 U.S.C. § 1334(b) and § 157(a) and (c), as it is related to the chapter 7 bankruptcy. Only Count VI of the Trustee's Amended Complaint, for turnover of estate property, is a core proceeding, but AutoZone has consented to entry of a final judgment by this Court as to all pending counts.

With the exception of Plaintiff's Count VI, the parties' claims are non-core breach of contract claims, and the Court looks to the parties' agreements and applicable non-bankruptcy law to determine the parties' rights and obligations. *See Kaplan v. First Options (In re Kaplan)*, 143 F.3d 807, 816 (3d Cir.1998); *Am. Flint Glass Workers Union v. Beaumont Glass Co.*, 62 F.3d 574, 581 (3d Cir.1995); *E. Elec. Sales Co. v. Gen. Elec. Co.*, 94 B.R. 348, 349 (E.D.Pa.1989). The Vendor Agreements govern the cross-obligations between Auto-Zone and the Companies and require application of Tennessee law; thus, this dispute will be decided in accordance with Tennessee law. (P–15, P–17, P–18, at p. 7, ¶ 14; Pretrial Order ¶ 8.) *See Suntex Indus. Corp. v. CIT Group/BBC, Inc.*, No. Civ.A. 99–81–RRM, 2001 WL 34401367, at *4, 2001 U.S. Dist. LEXIS 17656, at *10–11 (D.Del. Sept. 28, 2001) (*citing Annan v. Wilmington Tr. Co.*, 559 A.2d 1289, 1293 (Del.1989)).

### Equity Requires that the Debtors Be Treated as a Single Entity for Purposes of AutoZone's Affirmative Defenses.

 "The United States Supreme Court has long recognized that bankruptcy courts are courts of equity that apply equitable principles in the administration of bankruptcy proceedings." *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 339 (3d Cir.2006) (*citing Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). "The great principles of equity are aimed at securing complete justice for the parties before a court. Thus, the bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates." *Id.* (internal citations and quotation marks omitted).

 In deciding whether to disregard corporate distinctions, courts consider such factors as the corporation's failure to observe formalities, the non-functioning of officers and directors, an absence of corporate records, and whether the corporation

is merely a facade for the shareholder's operations. *See, e.g., Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 332 F.3d 188, 194 (3d Cir.2003).

The record is replete with evidence of the inextricable integration of the Companies' estates and corporate forms. The Companies' bankruptcy schedules list their assets (including accounts receivable) and liabilities in a single, consolidated set of statements and schedules that were certified by the Companies' then-Chief Restructuring Officer. (Claybrook Tr. I 139:9–12; D22.) According to the Trustee, this reflected the manner in which the Companies maintained their financial records:

> "American Remanufacturers was a consolidated entity. They filed consolidated tax returns. And the little history that I have of the company is that they acquired—they made acquisitions of different related vertically integrated companies that they rolled into their holding company or lead company.
>
> So my understanding is that since they consolidated and since that was the only type of financial and accounting that they had available, that they could only produce certain types of reports. They didn't have the ability to create individual financial statements for each entity. That's not my doing that was the Debtors' own recordkeeping and capacity that they had."

(Claybrook Tr. I 156:11–22) (quoting Trustee's prior deposition testimony.)

Since the Companies' bankruptcy filings and subsequent Conversion Date, the Trustee has administered the Companies at all times as a single entity, with no distinction between the assets, liabilities, creditors, distributions, or accounts of each entity. Importantly, all collections for any adversary proceeding on behalf of the Companies are paid into the ARI case and are not segregated for distribution to creditors of any other of the respective Debtors. (*See* Claybrook Tr. I 143:1–16, 156:25–158:12; D–22; D–27.)

Moreover, no claims remain pending in any of the Debtors' bankruptcy cases other than that of ARI, and all claims against CCT, ATSCO, and any of the other Debtors-regardless of how they were filed by creditors-are now reflected in the Court's records as claims against the estate of ARI. This is true for all claims filed by the Debtors' primary secured lender, Black Diamond, as well as for all claims filed by every other creditor against any of the ten Debtors. (*See* Gravenhorst Tr. I 183:6–185:9; Pretrial Order ¶¶ 18, 19.) No creditors of the distinct Debtors would stand to benefit from the artificial corporate separation that the Trustee is now attempting to achieve. The Trustee's attempt to segregate the Debtors' assets solely for purposes of setoff and recoupment in this accounts receivable case simply does not reflect the reality of his own case administration for the past five years.

With all money going into and out of a single account for all entities, no purpose would be served by requiring AutoZone to pay one Company, while another had to pay AutoZone—all should be equitably recouped. Any amounts owed to or payable from that single account should be netted.

AutoZone's treatment of the Companies as separate vendors in its books and records is irrelevant in determining whether it is equitable to separate the assets and liabilities of each Company. AutoZone entered into separate contracts with each of the Companies and maintained separate payment systems with each of the Companies. Nonetheless, the Trustee has treated the Companies as if they were consolidated. It would be illogical and inequitable for the Trustee to treat the

Companies as consolidated for purposes of his case in chief but then, based on AutoZone's records, to treat the Companies as separate entities to overcome AutoZone's defenses. The Trustee cannot use AutoZone's treatment of the Companies to prop up their otherwise nonexistent corporate integrity. As a matter of equity, AutoZone's defenses apply against the estates' common claim for payment, without regard to any artificial distinction among the Companies.

**AutoZone Is Entitled to $196,284 in Credit For Allowances, Claims, Fill Rate, Penalties, and Freight.**

When contract language is clear and unambiguous, the literal meaning of the contract terms governs the parties' obligations. *See Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (*citing Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn.2002)). "In such a case, the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" *Id.* (*quoting Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)).

The course of performance and dealing between parties to a contract is relevant in ascertaining the meaning of the contract and the scope of performance. *See Nashboro Records v. Pickwick Int'l, Inc.*, No. 85–265–II, 1986 WL 5324, at *5–6, 1986 Tenn.App. LEXIS 2990, at *13–14 (Tenn.Ct.App. May 9, 1986); *see also* Tenn.Code Ann. § 47–1–303(d).

The Vendor Agreements are clear and unambiguous; thus their plain language controls. The Agreements provide that the Companies are required to provide AutoZone credits against ·its purchases for allowances for advertising, promotions, freight, and fees. (*See* P–15, P–17, P–18, at pp. 1, 2, 3.) The Agreements also require the Companies to credit AutoZone for fill rate penalties, warranty claims of customers, and freight costs incurred by AutoZone. (*See* P–15, P–17, P–18, at pp. 3, 4, 6.)

The uncontroverted proof demonstrates that the Companies owe AutoZone credits in the amount of $56,252 for allowances, $7,495 for customer claims, $123,355 for fill rate penalties, and $9,182 for freight. (*See* P–3; P–4; P–5; D–7; D–8; D–9.)

Pursuant to the parties' course of performance under the Vendor Agreements and the ordinary course of their business, amounts owed by the Companies for allowances, claims, fill rate penalties, and freight were always netted against all open items, including purchases already made by AutoZone, to result in a single net remittance for a particular period. (*See* Meyer Tr. II 26:19–27:24.) Thus, AutoZone is entitled to credit against the total gross accounts receivable balance in the total amount of $196,284.

**AutoZone Is Entitled to $3,398,484 in Credit under the CDA.**

AutoZone is entitled to the full amount of principle outstanding under the CDA, plus any interest accrued thereon. Even though the CDA provided for CCT to make monthly payments to AutoZone, CCT's obligations accelerated under the terms of the CDA. The CDA provided that CCT would be required to pay immediately the amount of principle amount outstanding plus interest if (i) there occurred an event of default, (ii) AutoZone provided notice of the default, and (iii) CCT failed to cure the default within thirty days of receiving notice. (P16, ¶ 4.) An "event of default" was defined as including a voluntary or involuntary bankruptcy proceeding by or against CCT, with such proceeding continuing undismissed for 60 days. (*Id.*)

Here, CCT filed for bankruptcy protection on November 7, 2005, and the Trustee testified that AutoZone provided notice that it was accelerating the payment schedule under the CDA via letter to the Trustee's collection agent. (Claybrook Tr. I 128:22–129:22, 133:2–6; D–25.) There is no evidence that AutoZone ever failed to comply with any provisions of the CDA. The proof was that the parties had complied with and performed under the CDA until the Conversion Date. (*See* Meyer Tr. II 27:14–28:24; Riepenhoff Tr. II 186:12–187:19.) Thus, under the terms of the CDA, the future installments due to AutoZone became accelerated and the full unpaid balance of $3,398,484 became immediately due and owing to AutoZone. (*See* Meyer Tr. II:80:19–81:18, 88:2–7; D–2; D–6.)

 Even absent the CDA's acceleration clause, CCT would be obligated to pay the full amount outstanding under the CDA. Upon a debtor's bankruptcy filing, the principal amount of all claims against the debtor is accelerated. *See, e.g., Nationwide Mut. Ins. Co. v. Optel, Inc. (In re Optel, Inc.),* 60 Fed.Appx. 390, 394 (3d Cir.2003) (" 'It is a basic tenet of the Bankruptcy Code that bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.' ") (*quoting In re Manville Forest Prods. Corp.,* 43 B.R. 293, 297 (Bankr.S.D.N.Y.1984) (internal quotation marks and alterations omitted)); *see also In re Oakwood Homes,* 449 F.3d 588, 603 n. 19 (3d Cir.2006) (*quoting* H.R.Rep. No. 95–595, at 352–54, U.S. Code Cong. & Admin.News 1978, pp. 5963, 6307–10; *citing* 4–502 *Collier on Bankruptcy* P502.03) (recognizing automatic acceleration "whether or not a clause in a prepetition agreement provides that a bankruptcy filing accelerates the maturity date"). Under Tennessee law, that full accelerated balance may be offset against amounts owed to the debtor. *See Nashville Trust Co. v. Fourth Nat. Bank,* 91 Tenn. 336, 18 S.W. 822, 825–26 (1892) (finding that "insolvency is a good ground of equitable set-off, even where the indebtedness on one side is not due").

 Furthermore, the Trustee has admitted that the Companies owe the full amount outstanding under the CDA. A debtor's statements in its bankruptcy schedules may constitute admissions for purposes of proving liability. *See Sovran Bank v. Anderson,* 743 F.2d 223, 225 n. 1 (4th Cir.1984); *In re Garberg,* 2006 WL 1997415, at *5–6, 2006 Bankr.LEXIS 1468, at *17–18 (Bankr.E.D. Pa. June 7, 2006); *Morgan v. Musgrove (In re Musgrove),* 187 B.R. 808, 812 (Bankr.N.D.Ga.1995); *Larson v. Groos Bank,* 204 B.R. 500, 502 (W.D.Tex.1996). The Companies admitted in their original Schedule F to owing Auto-Zone the accelerated Core Devaluation Credit as a non-contingent, liquidated, undisputed claim, an admission of liability to AutoZone. (*See* Claybrook Tr. I 141:11–143:9, 143:1–16; D–22.) The Trustee's amendment to the Debtors' Schedule F on March 2, 2011, was self-serving and prejudicial to AutoZone, the Trustee has no personal knowledge of the information in the amendment. (Claybrook Tr. I 142:23–143:20, 145:3–147:4, 153:20–155:25; P–26.) Therefore, that information is not probative and will not be considered. *See* Fed. R.Evid. 602; *Snyder v. Rockland Trust Co. (In re Snyder),* 279 B.R. 1, 6 (1st Cir. BAP 2002) (stating that prejudice to a single creditor is sufficient basis to deny amendment); *Arnold v. Gill (In re Arnold),* 252 B.R. 778, 784 (9th Cir. BAP 2000); *Doan v. Hudgins (In re Doan),* 672 F.2d 831, 833 (11th Cir.1982).

Accordingly, AutoZone is entitled to $3,398,484 in Core Devaluation Credit against the gross accounts receivable. (*See* Meyer Tr. II 80:19–81:18, 88:2–7; D–

2; D–6.) Per the parties' course of dealing, that credit should be netted against open items. (*See* Meyer Tr. II 27:14–24.) The parties also agreed in the CDA that Auto-Zone may "offset any amounts due and payable under this Addendum" against the accounts receivable. (*See* P–16, ¶ 6.) This offset relates entirely to parts AutoZone had already purchased from CCT and did not relate to future purchases. (*See* Ingvardsen Tr. I 215:11–21; 216:2–25; Meyer Tr. II 82:25–83:4, 84:13–88:7; P–29.)

**AutoZone Is Entitled to $1,550,958 in Credit for Accepted Returns.**

 The Vendor Agreements also unambiguously provide that AutoZone is entitled to credit for Returns at Current Invoice Prices. (*See* P–15, P–17, P–18, at p. 4.)

Pre–Conversion, AutoZone returned, and the Companies accepted, Returns in the ordinary course of business, consistent with past practices. (*See* Meyer Tr. II 10:23–11:6, 66:6–67:9; P–3; P–4; D–10.) The Current Invoice Prices of the Accepted Returns, net of return reconciliations by AutoZone, is $1,550,958. Per the usual practice, AutoZone is entitled to credits for the Accepted Returns against the gross accounts receivable.

**AutoZone Is Entitled to $184,500 in Credit for Freight Settlements.**

 The Vendor Agreements unambiguously require the Companies to pay all freight charges for shipment of goods between AutoZone and the Companies. (*See* P–15, P–17, P–18, at pp. 3, 4, 6.) Per the parties' established course of performance, any freight costs incurred by AutoZone were invoiced as a credit and netted against all other open items existing in a particular pay period. (*See* Meyer Tr. II 30:19–31:4.)

When the Companies closed their doors, AutoZone incurred freight costs for shipments of Returns en route to the Companies, for which the Companies are liable. The cost incurred by AutoZone in settling with the Freight Carriers is $184,500, which amount AutoZone is entitled to deduct against the Accounts Receivable.

**AutoZone Is Entitled to $3,629,589 in Credit for Rejected Returns.**

 Under Tennessee law, "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn.Code Ann. § 47–2–301; *see also Henley Supply Co. v. Universal Constructors, Inc.,* 1989 WL 31620, *5, 1989 Tenn. App. LEXIS 260, *13–14 (Tenn.Ct.App. Apr. 7, 1989) (*citing Flowers Baking Co. of Lynchburg v. R–P Packaging, Inc.,* 229 Va. 370, 329 S.E.2d 462, 467 (1985)). "Tender entitles the seller to acceptance of the goods and to payment according to the contract." Tenn.Code Ann. § 47–2–507(1). After a seller tenders conforming goods, "the buyer has a positive duty to accept and his failure to do so constitutes a 'wrongful rejection' which gives the seller immediate remedies for breach." *Id.* § 47–2–602 cmt. 3. When goods are wrongfully rejected, the injured party is entitled to statutory remedies, including recovery of the "price" of the wrongfully rejected goods. *See id.* § 47–2–703(e); *id.* § 47–2–709. Those remedies are available even if the Companies' wrongful rejection was a result of their bankruptcy. *See, e.g., Diebold Inc. v. Positran Mfg., Inc.,* No. Civ.A 02–374 GMS, 2002 WL 31129726, at *3 (D.Del. Sept.26, 2002) (finding § 2–703 to "squarely" cover damages when a debtor refused to accept delivery of goods due to its bankruptcy).

The term "F.O.B. the place of shipment" is a delivery term under which "the seller must at that place ship the goods." Tenn.

Code Ann. § 47–2–319. This statute "is intended to negate the uncommercial line of decision which treats an 'F.O.B.' term as 'merely a price term.'" *See id.* at cmt. 1. Compliance with an F.O.B. shipment term constitutes tender by the seller. *See id.* § 47–2–503(2). The parties may alter the statutory terms by agreement. *See id.* § 47–2–319(1) ("Unless otherwise agreed....").

AutoZone accumulated Returns with Current Invoice Prices of $3,629,589 in its DCs, thereby tendering them to the Companies per the Vendor Agreements and triggering the Companies' obligation to accept them. (*See* Melton Tr. I 49:10–16; Meyer Tr. II 70:11–20.) Shipment of the Rejected Returns is immaterial to the Companies' obligation under the Vendor Agreements to accept the Returns. Pursuant to the Vendor Agreements, Returns were "F.O.B. AutoZone Dock," meaning that AutoZone's tender of the Returns occurred at its DCs, and the Companies were obligated to accept them upon that tender because AutoZone had open return privileges with the Companies. (*See* P–15, P–17, P–18, at p. 4.) That obligation of the Companies places AutoZone, in the context of the Returns and for purposes of Tenn. Code Ann. §§ 47–2–602, 47–2–703(e), and 47–2–709, in the position of "seller," and the Companies' refusal to accept any Returns from AutoZone following the Conversion Date constitutes wrongful rejection pursuant to those statutes. The Companies' failure to accept the Returns is wrongful rejection.

■ Due to the Companies' wrongful rejection, AutoZone is entitled to the price of the Rejected Returns, $3,629,589, to be credited against the accounts receivable. *See* Tenn.Code Ann. § 47–2–709. Though AutoZone made reasonable efforts to resell the Rejected Returns at a reasonable price, it was unable to do so. (*See*

Ingvardsen Tr. I 222:3–15; Melton Tr. II 147:18–148:11, 148:19–149:1.) AutoZone obtained only $40,081 for the Rejected Returns as scrap metal after the Trustee abandoned them, which is not a reasonable price when compared to the value of the Returns that AutoZone should have received from the Companies—$3,629,589 at Current Invoice Prices.

■ In addition, the sale did not result in an exhaustion of remedies under Section 47–2–702 as alleged by the Trustee because the exclusive remedy provision of the statute requires written demand of reclamation, which AutoZone did not provide. *See Montello Oil Corp. v. Marin Motor Oil, Inc. (In re Marin Motor Oil, Inc.),* 740 F.2d 220, 223 (3d Cir.1984); *Marlow v. Oakland Gin Co., Inc. (In re Julien Co.),* 128 B.R. 987, 999–1000 (Bank. W.D.Tenn.1991). The reclamation remedy is also inapplicable because the Companies never "received" the Rejected Returns, as required by the statute, because the Companies never took physical possession of them. *See* Tenn.Code Ann. § 47–2–103(c) ("'Receipt' of goods means taking physical possession of them."); *In re Marin,* 740 F.2d at 225; *Haywin Textile Prods., Inc. v. Bill's Dollar Stores, Inc. (In re Bill's Dollar Stores, Inc.),* 164 B.R. 471, 477 (Bankr.D.Del.1994). The Companies also were not provided the Rejected Returns "on credit," as required by Section 47–2–702, and the Companies made no written misrepresentation of solvency to AutoZone, as would be required to waive the ten-day limitation of the statute. The reclamation remedy is inapplicable.

**AutoZone Is Entitled to $43,875 in Credit for the Storage Costs.**

■ Upon wrongful rejection, the injured party is entitled to recover incidental damages, including "any commercially reasonable charges, expenses or commissions

incurred in stopping delivery [and/or] in the transportation, care and custody of goods after the buyer's breach." Tenn. Code Ann. § 47–2–709, 710.

When the Companies wrongfully rejected the Rejected Returns, AutoZone was forced to incur $43,875 in storage costs during the Trustee's extended delay before abandoning the Rejected Returns, during which time the Trustee demanded access to the Returns, requesting dates for inspection but failing to send anyone until May of 2008. (*See* Melton Tr. II 136:20–137:18, 145:17–147:10; Riepenhoff Tr. II 189:8–190:2; D–29; D–30; P–19, at p. 19–20.) As explained above, the Companies were in the position of "buyer" for the purposes of the Returns. Thus, pursuant to Tenn.Code Ann. §§ 47–2–709 and 47–2–710, AutoZone is entitled to these incidental damages arising from the Companies' wrongful rejection, to be credited against the Accounts Receivable.

**AutoZone Is Entitled to Recoup the Credits Against the Accounts Receivable.**

 Recoupment rights are determined by state law. *See DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.),* 435 B.R. 220, 226 (Bankr.D.Del.2010); *In re Village Craftsman,* 160 B.R. 740, 746 (Bankr.D.N.J. 1993). Under applicable Tennessee law, recoupment is "the right of a defendant to have a deduction from the amount of plaintiff's damages for the reason that the plaintiff has not complied with the cross obligations or independent covenants arising under the same contract." *Howard v. Abernathy,* 751 S.W.2d 432, 434 (Tenn.Ct. App.1988). The defense is not confined to abating the contract price of goods sold, but may also be applied to a defendant's damages growing out of and relating to the transaction on which the plaintiff's suit is founded. *Mack v. Hugger Bros. Const.*

*Co.,* 153 Tenn. 260, 283 S.W. 448, 449 (1925). "[T]he entire transaction, requiring the things agreed to be done on each side as the condition passing between the parties, must be considered," including duties "expressly or by implication imposed by the contract." Id. at 450. Recoupment is appropriate where the plaintiff has not complied with its own cross-obligations under the contract. *See Tenn. Indus. Mach. v. Accuride Corp.,* 139 S.W.3d 290, 294–95 (Tenn.Ct.App.2004); *Sledge & Norfleet v. Bondurant,* 5 Tenn. App. 319, 335–36 (App.Ct.1927).

Federal courts applying Tennessee law have likewise held that recoupment is available where the claims and defenses at issue arise out of the same contract. *See, e.g., Jahn v. U.S. Xpress, Inc. (In re Transcommunications Inc.),* 355 B.R. 668, 671 (Bankr.E.D.Tenn.2006) (creditor's recovery was a "proper recoupment because the circumstances that gave rise to both the overcharge and the necessity of correcting it arose from 'a set of reciprocal contractual obligations or from the same set of facts.'") (quoting *Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),* 156 F.3d 131, 134 (2d Cir.1998)); *Waldschmidt v. CBS, Inc.,* 14 B.R. 309, 314 (M.D.Tenn. 1981) ("Despite the trustee's contention, the advances and royalties involved in this case unquestionably arise from the same transaction. Both grow out of the recording contract between Mr. Jones and CBS."); *see also Nashboro,* 1986 WL 5324, at *5–6, 1986 Tenn.App. LEXIS 2990, at *14 (allowing recoupment where "the course of performance indicated an agreement whereby [plaintiff] would sell records and tapes to [defendant], and [defendant] could return the unsold portion of the merchandise, and [plaintiff] would accept the return and determine the amount of the credit to be given on the account").

Even though recoupment is a matter of state law, the scope of this non-statutory right is narrower in the bankruptcy context. *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.1992). In order for recoupment to apply, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations." *Id.*

Contrary to the Trustee's assertion, there is no strict requirement that credits must "match" accounts receivable for those credits to be recouped against the open accounts. Courts in this district, applying Tennessee law, have permitted parties to recoup sales credits due under a contract against accounts receivable owed pursuant to the same contract, but arising from unrelated sales. *See In re Commc'n Dynamics, Inc.*, 300 B.R. 220, 226–27 (Bankr.D.Del.2003) (finding recoupment available under Tennessee law, though the credits did not relate to the same equipment that the creditor's claims for accounts receivable were based on, because the agreement "contemplated the sale of multiple pieces of equipment," credits were typically earned "long after the Debtor had paid for the equipment," "credits were an integral part of the parties' overall relationship," and "the parties certainly intended that they be applied against future sales of equipment"); *In re Hechinger Inv. Co. of Del.*, Case No. 99–2261, Walsh, J. (Bankr.D.Del. May 4, 2000) (allowing recoupment where the parties' overall relationship was governed by a series of contracts and addenda because the credits were part of the overall dealings between the parties). It is irrelevant that an agreement does not "expressly contemplate that the credit with respect to the sale of one piece of equipment was available against amounts due for other equipment sales," and "there need not have been any express contractual right to withhold payments for the transaction to be recouped." *In re Commc'n Dynamics*, 300 B.R. at 227 (*citing In re Holford*, 896 F.2d 176, 178 (5th Cir.1990)). As stated in *In re Commc'n Dynamics:*

> The credits were an integral part of the parties' overall relationship under the Agreement and the parties certainly intended that they be applied against future sales of equipment. If [the creditor] were not permitted to recoup the sales credit against future equipment sales, that credit would be worthless. Thus, we conclude that the sales credits and equipment purchases are both part of a single integrated business transaction and are sufficiently related to one another to permit recoupment.

*Id.* Credits arising prepetition are recouped against purchases post-petition where the credits "are part of the overall dealing between" the parties and therefore "aris[e] out of the same transaction." *Hechinger*, Case No. 99–2261, at 79–80.

Here, as in *Commc'n Dynamics* and *Hechinger*, the credits issued by the Companies were an integral part of the parties' overall relationship and constituted a component of an integrated transaction between the parties. The Companies' business was to sell remanufactured auto parts, which they built from cores provided by retailers like AutoZone. In order for the Companies to remanufacture auto parts for sale to their customers, they needed AutoZone to return cores to be remanufactured. The parties therefore agreed that, for any particular remanufactured part purchased by AutoZone, AutoZone would pay an up-front core charge that would be later refunded to AutoZone in the form of a credit when AutoZone returned a core. The credit provided by

the Companies to AutoZone for returned cores was therefore a recoupment of the core charge previously paid by AutoZone to the Companies. (*See* Ingvardsen Tr. I 191:11–194:8, 219:3–220:14, 221:12–222:1, 233:4–10, 261:22–262:7; Riepenhoff Tr. II 182:24–183:10.)

As in *Commc'n Dynamics*, the parties intended for the credits to be applied against different purchases of product because the credits pertaining to a particular product or invoice were typically earned long after the original purchase was made. 300 B.R. at 226–27. Products that the Companies sold to AutoZone could sit on AutoZone's shelves for years before being sold, and even when sold the customer may not bring the core back for a long period of time. (*See* Ingvardsen Tr. I 217:6–12 ("it's too long of a period of time trying to match it all up.").) Thus, requiring the credits to match up to particular purchases would not only be flatly inconsistent with the parties' practice, it would be impossible in light of the industry and the ordinary course of business. (*See id.* at 220:15–221:7, 258:22–259:20; Meyer Tr. II 24:19–25:9.)

The way the parties conducted business and maintained their accounting records demonstrates that credits were not "matched" with particular invoices. Credits—regardless of the type—were netted against open accounts payable at the time a payment was made to determine the amount of the payment. (*See* Meyer Tr. II 26:6–13; Riepenhoff Tr. II 176:21–177:2.) All forms of credit were netted out with all purchases to result in a single remittance to each Company for a particular period. (*See* Meyer Tr. II 26:19–27:24, 63:10–65:3; Riepenhoff Tr. II 186:12–187:19.)

The credits were an integral part of the parties' agreements and overall relationship and were consistently applied against AutoZone's total open accounts. The giving and receiving of credits despite the inability to "match" those credits to goods previously sold to AutoZone was part and parcel of the parties' agreement and was the sole manner in which AutoZone and the Companies determined the net amount due between them over the entire course of their relationship. The inability of AutoZone to recoup those credits would render the credits worthless—a highly inequitable result that would allow the Companies to enjoy the benefits of the parties' agreements while ignoring their reciprocal obligations. *See In re Commc'n Dynamics*, 300 B.R. at 227.

AutoZone is entitled to recoup all credits owed to it by the Companies, in the amount of $9,003,690, against all outstanding invoices, in the amount of $4,557,476, such that the net amount due from Auto-Zone to the Companies is $0.

### CONCLUSION

For the foregoing reasons, AutoZone is entitled to apply its credits against the Companies' accounts receivables, on a consolidated basis. The Companies are, therefore, not entitled to any recovery from AutoZone. AutoZone is further entitled to judgment in its favor on all claims asserted by the Plaintiff in this case.

### ORDER

For the reasons set forth in the Court's Findings of Fact and Conclusions of Law of this date, Plaintiff is not entitled to any recovery from the Defendants. **SO ORDERED.**